In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 21-2151

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ROGER E. PACE,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court for the
Central District of Illinois.
No. 3:19-cr-30051 — **Sue E. Myerscough**, *Judge.*

———————————

ARGUED DECEMBER 6, 2021 — DECIDED SEPTEMBER 9, 2022

———————————

Before RIPPLE, WOOD, and KIRSCH, *Circuit Judges.*

RIPPLE, *Circuit Judge.* During a search of Roger Pace's vehicle, a police officer discovered methamphetamine. Mr. Pace was subsequently charged with possession with intent to distribute 50 grams or more of a mixture containing a detectable amount of methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B).

Mr. Pace filed a motion to suppress the drugs and other evidence found during the search of his SUV. The magistrate judge conducted an evidentiary hearing and then recommended that the district court deny the motion. After considering Mr. Pace's objections to the magistrate judge's report, the district court overruled those objections, adopted the report, and denied the motion to suppress.

Mr. Pace subsequently pleaded guilty but reserved his right to appeal the ruling on his suppression motion. At his sentencing hearing, Mr. Pace asserted that he was eligible for relief from the five-year statutory minimum sentence pursuant to the "safety valve" provision of 18 U.S.C. § 3553(f). The district court determined, however, that Mr. Pace did not qualify for the safety valve and sentenced him to 60 months' imprisonment.

Mr. Pace now asks us to review both the district court's denial of his motion to suppress and its ruling that he did not qualify for the safety valve. We hold that the district court correctly determined that the search of Mr. Pace's vehicle was based on reasonable suspicion and that he did not qualify for the safety valve. Accordingly, we affirm the judgment of the district court.

## I

## BACKGROUND

### A.

On April 5, 2019, at around 10:30 p.m., Officer Ryan Crowder observed a white SUV in the parking lot of a local business. An individual was sitting inside the SUV. That night, Officer Crowder was the only police officer on duty in the small town of Pleasant Hill, Illinois. He testified that he

pulled into the parking lot to investigate the SUV because it was nighttime, the business was closed, and he had never seen that particular SUV in Pleasant Hill. As soon as Officer Crowder pulled his car alongside the SUV, Mr. Pace exited his vehicle and started speaking with him. Mr. Pace explained that he was in town visiting his friend, Jennifer Johns, but was lost and needed directions to Carolina Street where Johns lived.

Officer Crowder knew of Johns and of her past methamphetamine use. Indeed, Johns previously had provided information to Officer Crowder about methamphetamine use in Pleasant Hill, and this information had led to the arrest of a person for possession of the drug. A member of the Western Central Illinois Task Force also had informed him that a confidential source reported that Johns and her mother were using and moving methamphetamine. Finally, Officer Crowder had received complaints from Johns's neighbors about frequent traffic at her home, which was consistent with drug trafficking. Officer Crowder testified that Mr. Pace's mention of Johns's name and of his planned late-night visit to her residence therefore raised a red flag.

After providing Mr. Pace with directions to Johns's home, Officer Crowder backed up his police car, activated his emergency lights, and parked directly behind Mr. Pace's SUV. At this point, less than one minute had elapsed from the time that Officer Crowder had initially stopped.[1] While Officer Crowder moved his squad car, Mr. Pace stood in front of his SUV and talked on his phone. The exit to the parking lot was

---

[1] The dashcam video recording from Officer Crowder's squad car was admitted in the evidentiary hearing as Government's Exhibit 2. R.19-2.

in front of Mr. Pace's car; nothing obstructed his ability to drive away.

Officer Crowder then approached Mr. Pace again and asked for his driver's license. Shining his flashlight inside the SUV, he did not see any weapons or contraband but did see multiple musical instrument cases. Mr. Pace walked to the back of his SUV and attempted to get one of the instruments out to play for Officer Crowder but was asked to leave it in the vehicle. Mr. Pace's behavior struck Officer Crowder as very odd and overly friendly, yet nervous at the same time. Officer Crowder attempted to radio Mr. Pace's driver's license into dispatch to confirm its validity and to ascertain whether Mr. Pace had any warrants. Discovering that his portable radio was not working, Officer Crowder returned to his squad car with Mr. Pace's license and waited for dispatch to respond. He also called an officer from another agency to determine whether he could assist, but the officer was busy.

Dispatch confirmed that Mr. Pace's license was clear and that he had no outstanding warrants. It further indicated, however, that he had a history of drug possession including methamphetamine, narcotic instruments, and drug paraphernalia. Officer Crowder also checked a website that provides a person's criminal history from several jurisdictions. According to the site, Mr. Pace was on probation for possession of methamphetamine.[2] After exiting his squad car, Officer Crowder inquired whether Mr. Pace had any weapons. Mr. Pace denied that he did and consented to a search of his

_____

[2] The website is www.judici.com, which explicitly states that it is not to be relied upon for accuracy.

person. Officer Crowder then asked if Mr. Pace would consent to a search of his SUV, but Mr. Pace declined.

At that point, Officer Crowder informed Mr. Pace that he was going to conduct a free air sniff of his SUV with his canine partner. Officer Crowder then explained to Mr. Pace that he was not under arrest, but that he was going to place him in restraints during the sniff for officer safety. He handcuffed Mr. Pace's hands in front of his body. Both Officer Crowder and Mr. Pace walked back to the SUV, and Mr. Pace retrieved an item from the front of the vehicle. Officer Crowder then placed him in front of his squad car. Officer Crowder retrieved his K-9 from the squad car. After the dog alerted to the presence of drugs in the SUV, Officer Crowder searched the SUV and found both methamphetamine and cannabis. Officer Crowder then arrested Mr. Pace and placed him inside the squad car.

**B.**

Following his indictment for possession with intent to distribute methamphetamine, Mr. Pace filed a motion to suppress, asserting that all evidence obtained from the seizure, search, and arrest should be suppressed. The magistrate judge conducted a hearing on the motion and determined that the initial interaction between Mr. Pace and Officer Crowder was consensual. The judge also concluded that Officer Crowder's use of his emergency lights did not constitute a seizure for purposes of the Fourth Amendment, but, in any event, Officer Crowder had reasonable articulable suspicion at that point in time to conduct a limited investigative stop to check Mr. Pace's license. The magistrate judge also concluded that once Officer Crowder learned of Mr. Pace's criminal history, he had sufficient information to conduct a free air sniff

of Mr. Pace's SUV. Finally, the magistrate judge rejected the argument that an arrest occurred when the officer handcuffed Mr. Pace. An arrest occurred only after the completion of the search of the vehicle and the discovery of the drugs.

Mr. Pace filed several objections to the magistrate judge's report. He objected to the magistrate judge's determination that his encounter with Officer Crowder was consensual, that Officer Crowder's testimony was credible, that the activation of the squad car's emergency lights did not constitute a seizure, that Officer Crowder had reasonable suspicion when he activated the emergency lights, and that he was not placed under arrest when he was handcuffed. He contended that the facts demonstrated Officer Crowder "relied on nothing more than the name 'Jennifer Johns' to detain Mr. Pace, and that [was] not sufficient to establish reasonable suspicion."[3]

These arguments did not persuade the district court. In a written opinion, the court overruled Mr. Pace's objections and adopted the magistrate judge's report and recommendation. The court held that Mr. Pace's initial encounter with Officer Crowder was consensual, that Officer Crowder had reasonable suspicion to conduct a limited investigatory stop to check Mr. Pace's license,[4] and that, based on the totality of the circumstances, the squad car's emergency lights were activated appropriately as part of an investigatory stop.[5]

---

[3] R.31 at 12.

[4] R.37 at 17.

[5] "Officer Crowder had reasonable suspicion to conduct an investigatory stop—when Officer Crowder activated his emergency lights and when he took Defendant's license back to the police vehicle." *Id.* at 21.

Finally, the district court held that Officer Crowder had not placed Mr. Pace under arrest by handcuffing him during the search of the SUV. Having made these determinations, the district court denied the motion to suppress.

Mr. Pace then pleaded guilty but reserved his right to appeal the district court's ruling on the suppression motion. The probation office prepared a Presentence Report and did not deem him eligible for safety-valve relief under 18 U.S.C. § 3553(f).[6] Mr. Pace maintained that he was eligible for the safety valve, was not subject to a mandatory minimum sentence, and was entitled to a two-level reduction in his offense level.[7] Under Mr. Pace's interpretation of § 3553(f)(1), he was eligible for safety-valve relief because he did not have a prior 2-point violent offense, as required under § 3553(f)(1)(C). Noting a division between the circuits on the issue, Mr. Pace also contended that the rules of lenity and fair warning should apply.

At the sentencing hearing, the district court rejected Mr. Pace's interpretation of safety valve eligibility found in § 3553(f)(1). The district court had previously addressed and rejected arguments identical to Mr. Pace's in *United States v. Howell*, No. 20-CR-30075-1, 2021 WL 2000245 (C.D. Ill. May 19, 2021). Relying on that opinion, the district court

---

[6] The safety valve requires federal courts to impose a sentence "without regard to any statutory minimum sentence" if the defendant satisfies the five requirements set forth in § 3553(f)(1)–(5).

[7] A defendant who qualifies for the safety valve also receives a two-level guideline reduction. *See* U.S.S.G. § 2D1.1(b)(18) ("If the defendant meets the criteria set forth in subdivisions (1)–(5) of subsection (a) of § 5C1.2 … decrease by 2 levels.").

concluded that Mr. Pace's proposed interpretation gave rise to absurd results. The court therefore sentenced Mr. Pace to the statutory minimum sentence of 60 months. Mr. Pace filed a timely notice of appeal.

## II

## DISCUSSION

### A.

In examining a district court's denial of a motion to suppress, we review its findings of historical fact for clear error and its conclusions of law de novo. *See United States v. Ruiz*, 785 F.3d 1134, 1140–41 (7th Cir. 2015); *United States v. Eymann*, 962 F.3d 273, 281 (7th Cir. 2020).

### 1.

Mr. Pace first submits that his initial encounter with Officer Crowder was not consensual. Mr. Pace contends that after Officer Crowder learned of his "completely innocent explanation" for his presence in the parking lot—being lost and looking for a friend's home—he nevertheless detained him on nothing more than a hunch. In response, the Government, noting that Mr. Pace voluntarily exited his vehicle and commenced a conversation with the officer, submits that his interaction with Officer Crowder was a consensual encounter.

A seizure occurs when "taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Florida v. Bostick*, 501 U.S. 429, 437 (1991) (quotation omitted). "Whether a police-citizen encounter is consensual is a question of fact, and we therefore review it for clear error."

*United States v. Whitaker*, 546 F.3d 902, 906 (7th Cir. 2008). The Supreme Court has stated clearly that there is no constitutionally cognizable seizure "simply because a police officer approaches an individual and asks a few questions." *Bostick,* 501 U.S. at 434. Indeed, we have noted expressly that in a consensual encounter "the degree of suspicion [that is] required is zero." *United States v. Serna-Barreto*, 842 F.2d 965, 966 (7th Cir. 1988).

In determining whether an encounter is consensual, we have provided a nonexclusive, non-exhaustive list of factors for the district courts to consider:

> • where the interaction took place, including whether it was in public;
> • how many police officers were present;
> • the extent to which the police presence was threatening;
> • whether the officers made any show of weapons or physical force;
> • the officers' language and tone;
> • whether the police suggested the defendant was suspected of crime; and
> • whether officers told the defendant he was free to leave.

*United States v. Holly*, 940 F.3d 995, 1000 (7th Cir. 2019).

Here, the record supports the district court's determination that the initial encounter was, viewed objectively, consensual. It also reveals that the district court employed the appropriate methodology in assessing the facts contained in the record. The court considered the factors listed in *Holly*. It noted that the encounter took place outside; Officer Crowder

did not force Mr. Pace to stop as his vehicle was already parked; only one officer was present; there was no threatening presence or show of authority; and Mr. Pace moved about freely during their initial interaction. Furthermore, when he first stopped, Officer Crowder inquired whether Mr. Pace needed help, and he did not act in a manner that would have communicated to Mr. Pace that he could not leave.[8] Reaching a decision compatible with our case law,[9] the district court considered the applicable factors, all of which pointed to the conclusion that the encounter was consensual. The district court, therefore, did not clearly err.

**2.**

Mr. Pace next contends that the information that became known to Officer Crowder following the initial encounter did not establish reasonable suspicion to prolong the encounter. In his view, Officer Crowder's initial exchange with Mr. Pace left him with only "hunches" that Johns and her mother were involved with methamphetamine.[10] Consequently, Officer Crowder lacked reasonable suspicion to activate his emergency lights, to reposition his squad car behind the SUV, to

---

[8] R.19-2.

[9] *See, e.g.*, *United States v. Lickers*, 928 F.3d 609, 616 (7th Cir. 2019) (finding it was reasonable for the officers to ask whether the defendant needed help and noting that the Fourth Amendment is not triggered when "officers merely approach an individual in a public place and ask a few questions." (quotation omitted)).

[10] In the evidentiary hearing, Officer Crowder testified that there were no active warrants for Johns's arrest, no active search warrants for her home, and that he had received no tips that either she or her mother would receive methamphetamine that evening. R.25 at 57–58.

check the status of Mr. Pace's driver's license, or to determine his criminal background, if any. In the Government's view, Officer Crowder had reasonable suspicion as a result of his initial conversation with Mr. Pace. It submits that the officer was therefore on solid ground when he took each of these actions.

It is well established that a police officer can stop and detain briefly a person for investigative purposes when the officer has a reasonable suspicion, supported by articulable facts, that criminal activity is afoot. *Terry v. Ohio*, 392 U.S. 1, 21–22 (1968). "Reasonable suspicion exists only when an officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Eymann*, 962 F.3d at 282 (quotation omitted). Thus, "[w]hile reasonable suspicion requires something less than what is necessary to show probable cause, it requires more than a mere 'hunch.'" *United States v. Ienco*, 182 F.3d 517, 523 (7th Cir. 1999). Information lawfully obtained during an initial consensual encounter "may provide the officer with reasonable suspicion of criminal conduct that will justify prolonging the stop to permit a reasonable investigation." *United States v. Figueroa-Espana*, 511 F.3d 696, 702 (7th Cir. 2007).

Our examination of the record convinces us that the information that Officer Crowder learned during the initial encounter justified his conclusion that additional investigation was warranted. Given his reasonable suspicion that Mr. Pace's intended late-night visit to individuals suspected of dealing in methamphetamine could involve illegal drug activity, placing his vehicle behind Mr. Pace's SUV, activating the squad car's lights, and then asking for Mr. Pace's driver's

license were reasonable steps for the officer to take.[11] Specific, articulable facts, when viewed objectively, justified a brief investigation to confirm or dispel the suspicion that Mr. Pace's visit was drug-related and not social.[12]

We cannot accept the view that the information then known to Officer Crowder was too vague to justify his course of proceeding. The Government appropriately emphasizes that: (1) within the last year, Officer Crowder had observed Johns to be high on what he believed to be methamphetamine; (2) two months prior, Johns had given Officer Crowder information on methamphetamine use in Pleasant Hill, which had led to an arrest; (3) Officer Crowder received information from a task force officer that Johns and her mother were involved in methamphetamine use; and (4) Johns's neighbors had complained to Officer Crowder about the amount of

---

[11] Contrary to Mr. Pace's assertion, this case is not like *United States v. Segoviano*, 30 F.4th 613 (7th Cir. 2022). In *Segoviano*, we determined that there were absolutely no facts tying the defendant to the crime at issue, nor was there "particularized suspicion" that he was engaged in wrongdoing. Here, Mr. Pace was from out-of-town, in a parking lot late at night, and he provided information to Officer Crowder that directly tied him to a known methamphetamine user. While Officer Crowder was already suspicious that Johns was dealing narcotics from her home, it was Mr. Pace's explanation of his presence in Pleasant Hill that supplied the particularized suspicion that he might be involved in dealing methamphetamine.

[12] *See Hayes v. Florida*, 470 U.S. 811, 816 (1985) ("[I]f there are articulable facts supporting a reasonable suspicion that a person has committed a criminal offense, that person may be stopped in order to identify him, to question him briefly, or to detain him briefly while attempting to obtain additional information.").

traffic at her home that was consistent with drug trafficking.[13] This information about Johns, in combination with Mr. Pace's explanation of why he was in Pleasant Hill so late in the evening, supplied the reasonable suspicion that justified Officer Crowder's decision to detain Mr. Pace for further investigation.[14] This prolongation of the encounter constituted an investigatory stop.[15]

**3.**

Finally, Mr. Pace submits that even if Officer Crowder had reasonable suspicion to detain him, he did not have probable cause to arrest him. In Mr. Pace's view, Officer Crowder arrested him by placing him in handcuffs prior to the K-9 search of the exterior of the SUV.

Following Mr. Pace's denial of consent to search the SUV, Officer Crowder then told Mr. Pace that he was going to conduct a free air sniff of the SUV with his canine partner. At the evidentiary hearing, Officer Crowder explained that Mr. Pace had been compliant through all his interactions with him, but

---

[13] Appellee's Br. 21–22.

[14] *See United States v. Yang*, 39 F.4th 893, 901 (7th Cir. 2022) (recognizing that while alternative inferences from what the officer observed could have been drawn, the other potentially innocuous causes did not negate reasonable suspicion).

[15] *See Florida v. Royer*, 460 U.S. 491, 501 (1983) (noting that when a defendant's ticket and driver's license were retained without any indication from officers that he was free to depart, the defendant was effectively seized for purposes of the Fourth Amendment); *United States v. Ahmad*, 21 F.4th 475, 481 (7th Cir. 2021) (holding that whether retention of a driver's license constitutes a seizure depends upon "*how long* and *under what circumstances* the suspect's identification documents were retained").

he still believed that use of handcuffs was necessary for his own safety. Officer Crowder testified, "I explained to him that at this point that he was not under arrest, that I was going to place him in restraints for my officer safety at that point."[16] Mr. Pace's hands were cuffed in front of his body, he was not placed in the squad car, and he was still able to walk about freely.

Mr. Pace now maintains that Officer Crowder arrested him when the officer put him in handcuffs. As Mr. Pace sees it, the record is devoid of any evidence that the handcuffing accomplished any purpose other than to escalate the encounter into an arrest, an escalation which Officer Crowder had planned from the outset. The Government takes a different view. It counters that because Officer Crowder was the only officer on the scene, he was justified in handcuffing Mr. Pace, while he retrieved his canine partner from the squad car and conducted a search of the SUV.

"Subtle, and perhaps tenuous, distinctions exist between a *Terry* stop, a *Terry* stop rapidly evolving into an arrest and a *de facto* arrest." *United States v. Tilmon*, 19 F.3d 1221, 1224 (7th Cir. 1994). "We have been unwilling to hold that the handcuffing of a suspect without probable cause to arrest is unlawful per se." *United States v. Smith*, 3 F.3d 1088, 1094 (7th Cir. 1993). Instead, we have recognized the "'rare' case wherein common sense and ordinary human experience convince us that an officer believed reasonably that an investigative stop could be effectuated safely only through the use of handcuffs." *Id.* (quoting *United States v. Boden*, 854 F.2d 983, 993 (7th Cir. 1988)). In short, we have "recognized a limited set of

---

[16] R.25 at 42:16–19.

circumstances in which handcuffs are appropriate without converting a *Terry* stop into a full arrest. Chief among them is officer safety and the possibility of the presence of a weapon." *Howell v. Smith*, 853 F.3d 892, 898 (7th Cir. 2017).

Although Officer Crowder admitted that he did not feel threatened by Mr. Pace at any point during their interaction, he certainly was entitled to take into consideration that he was the only officer on duty and that back-up officers were over a twenty-minute drive away. In making the decision to use handcuffs, Officer Crowder also could take into account that Mr. Pace was from out-of-town, that it was late at night, that Mr. Pace had stated that he was in town to visit the home of a suspected methamphetamine dealer, that Mr. Pace had a criminal history of possessing methamphetamine, and that he had denied consent for the search of his vehicle. Notably, Officer Crowder explicitly told Mr. Pace that he was not under arrest.

The district court did not err in denying Mr. Pace's motion to suppress. Instead, it properly determined that Mr. Pace's initial encounter with Officer Crowder was consensual. From the ensuing conversation, he gained reasonable suspicion that justified detaining Mr. Pace for further investigation. Mr. Pace was not placed under arrest until after the search of his SUV and the discovery of methamphetamine. At that point, there certainly was probable cause to arrest Mr. Pace. The district court correctly denied Mr. Pace's motion to suppress.

**B.**

We now turn to the sentencing phase of the district court proceedings. Here, Mr. Pace contends that the district court

erred in not affording him the benefit of the "safety valve" provision in 18 U.S.C. § 3553(f)(1).

"We review the district court's interpretation of the safety-valve provision under the statute and the sentencing guidelines de novo." *United States v. Collins*, 924 F.3d 436, 441 (7th Cir. 2019). The defendant bears the burden of establishing eligibility for the safety-valve exemption from a mandatory minimum sentence. *See United States v. Draheim*, 958 F.3d 651, 658 (7th Cir. 2020).

**1.**

The safety valve provision "create[s] more flexibility in sentencing by permitting courts to sentence below the minimum sentences fixed by statute." *United States v. Syms*, 846 F.3d 230, 235 (7th Cir. 2017). The provision is designed to benefit "first-time, non-violent drug offenders who were not organizers of criminal activity and who have made a good-faith effort to cooperate with the government." *Id.* (quoting *United States v. Arrington*, 73 F.3d 144, 147 (7th Cir. 1996)).

In order to qualify for the benefit of the safety valve provision, a defendant must satisfy certain requirements set out in the statute. Specifically, the safety valve requires defendants to satisfy five elements found in 18 U.S.C. § 3553(f), one of which pertains to a defendant's criminal history. In the First Step Act of 2018, Congress replaced the criminal-history element of § 3553(f)(1), which originally had only required a defendant to not have more than one criminal history point, with the current list of three criminal-history conditions now found at § 3553(f)(1)(A)–(C). The relevant portion of the statute now states:

> (f) Limitation on Applicability of Statutory Minimums in Certain Cases.—Notwithstanding any other provision of law, … the court shall impose a sentence pursuant to guidelines … without regard to any statutory minimum sentence, if the court finds at sentencing … that—
>
> (1) the defendant does not have—
>
>> (A) more than 4 criminal history points, excluding any criminal history points resulting from a 1-point offense, as determined under the sentencing guidelines;
>> (B) a prior 3-point offense, as determined under the sentencing guidelines; **and**
>> (C) a prior 2-point violent offense, as determined under the sentencing guidelines … .

§ 3553(f)(1) (emphasis added).

Mr. Pace submits that he is eligible for the safety valve because he does not meet the criterion of subsection (C): he does not have a prior two-point violent offense. Mr. Pace asserts that the word 'and' in § 3553(f)(1) "must be read in its natural, conjunctive meaning, which only disqualifies defendants who fail each of § 3553(f)(1)(A), (B), 'and' (C)."[17] The district court disagreed and determined that satisfying *even one* of the subsections listed in § 3553(f)(1) resulted in safety-valve ineligibility.

Mr. Pace continues to assert that a defendant is only disqualified from the application of the safety valve if he fails to

---

[17] Appellant's Br. 36.

satisfy each of § 3553(f)(1)'s subsections (A), (B), and (C). In response, the Government contends that when read as a whole, the text, context, and purpose of § 3553(f) only allow one interpretation: that a defendant is disqualified from the safety valve if he has (A) more than four criminal history points, *or* (B) a prior three-point offense, *or* (C) a prior two-point violent offense. Thus, the Government asserts that Mr. Pace is not eligible for the safety valve because he meets the criteria of subsections (A) and (B).

**2.**

We have not yet had the occasion to address whether § 3553(f)(1) requires a defendant to meet all three subsections or just one of the subsections to be eligible for the safety valve. Three other circuits have addressed this question but have reached differing conclusions.[18] The Eleventh Circuit held that a defendant who meets any *one* of the three subsections is disqualified from safety-valve eligibility. *See United States v. Garcon*, 997 F.3d 1301, 1306 (11th Cir. 2021) (adopting the disjunctive approach). Notably, the Eleventh Circuit's decision was recently vacated as the court decided to take up the issue en banc.[19] More recently, the Eighth Circuit held that "[a]

---

[18] These two conclusions have been represented helpfully as the "conjunctive" argument and the "disjunctive" argument. Here, Mr. Pace is asserting the conjunctive argument by claiming that a defendant is only ineligible for safety-valve relief if he meets the criteria of all three subsections. The disjunctive argument asserts that the use of "and" should be read as "or," thus meeting any one of the subsections makes a defendant ineligible for safety-valve relief. This court also recognizes a similar question is before the Fifth Circuit, but no decision has been issued yet in *United States v. Palomares*, No. 21-40247 (5th Cir. argued Feb. 1, 2022).

[19] *United States v. Garcon*, 23 F.4th 1334 (11th Cir. 2022) (mem.).

defendant qualifies under § 3553(f)(1) if he 'does not have—' the criminal history points specified in (A), the prior offense listed in (B), *and* the prior offense listed in (C)." *United States v. Pulsifer*, 39 F.4th 1018, 1021 (8th Cir. 2022). In contrast, the Ninth Circuit held that only a defendant who meets the criteria of *all* three subsections is disqualified. *See United States v. Lopez*, 998 F.3d 431, 437 (9th Cir. 2021) (adopting the conjunctive approach).

Here, the district court determined at the sentencing hearing that Mr. Pace was not eligible for the safety valve because he satisfied at least one of the subsections of § 3553(f)(1). The district court recognized the disagreement among the circuits on the issue but stated that the Ninth Circuit's reasoning in *Lopez* had not convinced it that its previous decision on the same issue in *Howell*, 2021 WL 2000245 was incorrect. In *Howell*, the district court provided several reasons for rejecting the defendant's safety-valve argument: (1) the conjunctive interpretation rendered part of § 3553(f)(1) superfluous and gave rise to absurd results; (2) the legislative history of the First Step Act's Safety Valve expansion supported a disjunctive interpretation; and (3) the rule of lenity did not apply.

The primary arguments addressed by the parties on appeal are based on the statutory text of § 3553(f), the legislative history of the statute, the canons of construction when interpreting the statute, and the rule of lenity. We will address each.

Mr. Pace's chief argument relies on the plain language of § 3553(f)(1). He stresses the conjunctive use of the word "and" as it is commonly understood. He stresses, as did the defendants in *Howell*, "that if the list elements were meant to be individually prohibited, Congress would have used the word

'or' instead of 'and,' as 'or' normally functions disjunctively."
*Howell*, 2021 WL 2000245, at *2. Mr. Pace also points to the use
of "and" in the other sections of § 3553(f) and notes that "and"
is used conjunctively between § 3553(f)(4) and (5).[20] Mr. Pace
also relies on our holding in *United States v. Draheim*, 958 F.3d
651, 658 (7th Cir. 2020), where we determined that the "and"
within § 3553(f)(4) is conjunctive. Thus, in two other places in
the same statute, argues Mr. Pace, the word "and" is used con-
junctively.

The Government maintains that the provision should be
read disjunctively. It stresses that the context in which lan-
guage is used matters and that the meaning of a word cannot
be determined in isolation. *See Yates v. United States*, 574 U.S.
528, 537 (2015). The Government submits that the word "and"
can mean "joint and several," and § 3553(f)'s text suggests that
usage in this context. The Government also contends that the
statute's use of the em-dash to connect the lead-in ("does not
have") in § 3553(f)(1) to the subsection list (A)–(C) suggests
that the lead-in modifies each subsection. Finally, the Govern-
ment asserts that § 3553(f)(1) is the only provision of § 3553(f)
that sets out a list of elements framed in the negative, which
makes it structurally different from § 3553(f)(4), thus requir-
ing different treatment.

### 3.

"As with all issues of statutory interpretation, the appro-
priate place to begin our analysis is with the text itself, which
is the most reliable indicator of congressional intent." *Bass v.*

---

[20] The use of the conjunctive between subsections (4) and (5) means that a
defendant is eligible for the safety valve if he can establish that he satisfies
each of subsections (1), (2), (3), (4), and (5).

*Stolper, Koritzinsky, Brewster & Neider, S.C.*, 111 F.3d 1322, 1324–25 (7th Cir. 1997) (citation omitted). We also read a statute "as a whole" rather than "as a series of unrelated and isolated provisions." *Arreola-Castillo v. United States*, 889 F.3d 378, 386 (7th Cir. 2018) (first quoting *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991); and then quoting *Gonzales v. Oregon*, 546 U.S. 243, 273 (2006)).

Here, the two suggested interpretations of § 3553(f)(1) are not equally plausible. The conjunctive argument creates more problems than solutions and renders a portion of the statute superfluous. Although Mr. Pace is correct that the word "and" is commonly utilized conjunctively and is used in that way in other parts of § 3553(f), the context of the word "and" in § 3553(f)(1) supports the view that it should be read disjunctively. If disqualification results only when a defendant meets each of the subsections, subsection (A) is superfluous. If a defendant meets subsection (B) requiring a three-point offense, and subsection (C) requiring a two-point violent offense, then he would automatically have more than the four criminal history points required by subsection (A). This interpretation of the statute therefore cannot be squared with the canon against surplusage.[21] By contrast, the "disjunctive" interpretation gives independent meaning to all three subsections; it does not render subparagraph (A) meaningless.

The placement of the word "and" also supports a disjunctive reading. The use of the em-dash following subsection one of § 3553(f) (see below) to connect the subsections

---

[21] *See Hibbs v. Winn*, 542 U.S. 88, 101 (2004) ("A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." (citation omitted)).

demonstrates that the lead-in "does not have" modifies each subsection requirement:

> (1) the defendant does not have—
>
>> (A) more than 4 criminal history points, excluding any criminal history points resulting from a 1-point offense, as determined under the sentencing guidelines;
>> (B) a prior 3-point offense, as determined under the sentencing guidelines; and
>> (C) a prior 2-point violent offense, as determined under the sentencing guidelines … .

Thus, the em-dash serves to modify each requirement: *does not have* more than 4 criminal history points, *does not have* a prior 3-point offense, and *does not have* a prior 2-point violent offense. This reading of the statute gives proper meaning to the word "and" while also treating the subsections as a checklist of requirements a defendant must not have in order to be eligible for the safety valve. Our colleagues in the Eighth Circuit recently employed an approach that, although employing different nomenclature, is conceptually quite compatible with our emphasis on the em-dash. In *Pulsifer*, 39 F.4th at 1021, that court emphasized that "and" should be read conjunctively and distributed across the subsections. It found a "strong textual basis [for preferring] a distributive reading of 'and' in § 3553(f)." *Id*. It noted: "The practical effect of reading 'and' in its distributive sense is that § 3553(f)(1) serves as an eligibility checklist for offenders who seek to avail themselves of the limitation on statutory minimums. The text distributes the introductory phrase 'does not have' across each statutory condition." *Id*. at 1022. In short, the most important textual basis

for this "distributive" reading is Congress's use of the em-dash.

In response to the em-dash argument, Mr. Pace invites our attention to the em-dash at the end of the introductory paragraph for the entire subsection (f) of the statute. Attributing the same interpretation to this em-dash as we have to the introductory phrase of section (f)(1) would destroy the entire safety valve structure in § 3553(f) and would allow a person to be eligible for the safety valve if he satisfied just one of the provisions rather than all five of the provisions of section (f). But again, context matters. Section (f) as a whole is framed in the positive; subsection (f)(1) is framed in the negative. As a defendant need not meet each of the requirements of subsections (A), (B), *and* (C) to satisfy § 3553(f)(1), he must meet the requirements of (f)(1), (f)(2), (f)(3), (f)(4), *and* (f)(5) to fulfill the requirements of § 3553(f).

Moreover, Mr. Pace's interpretation of the statute produces absurd results. A defendant who had multiple three-point violent offenses under subsection (B) would still be safety-valve eligible so long as he did not have a prior two-point violent offense under subsection (C). This interpretation would afford leniency to defendants with more serious offenses (those serious enough to receive three criminal history points) while denying safety-valve eligibility to the defendants with less serious offenses that received only two points.

Mr. Pace attempts to avoid the absurdity argument by suggesting that Congress intended to expand the safety valve in 2018 to give district courts more discretion in avoiding situations where drug offenders may receive an unduly harsh sentence because of a mandatory minimum. But the Government notes that the legislative history from the Senate

Judiciary Committee as well as guidance from the Sentencing Commission support its disjunctive argument. The Senate Judiciary Committee stated that the Act expanded safety-valve relief "to include offenders with up to four criminal history points," but that offenders "with prior '3-point' felony convictions … or prior '2-point' violent felony offenses … will *not* be eligible." S. Comm. on the Judiciary, 115th Cong., *The First Step Act of 2018 (S.3649)*—as introduced, at 2 (2018). As for the Sentencing Commission, it has previously stated that "a defendant with any '2-point violent offense' is ineligible for the safety valve." United States Sent'g Comm'n, *First Step Act*, at 6 (Feb. 2019).

Finally, Mr. Pace asserts that if this court finds there to be two equally plausible interpretations of "and" in § 3553(f)(1) then it is bound by the rule of lenity. The rule of lenity "applies only when, after consulting traditional canons of statutory construction, we are left with an ambiguous statute." *United States v. Shabani*, 513 U.S. 10, 17 (1994). Only if, "after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute such that the Court must simply guess as to what Congress intended[,]" then the rule of lenity applies. *Maracich v. Spears*, 570 U.S. 48, 76 (2013) (quoting *Barber v. Thomas*, 560 U.S. 474, 488 (2010)).

Here, there are not equally plausible interpretations such that the rule of lenity comes into play. As the Government points out, "[t]he mere possibility of articulating a narrower construction … does not by itself make the rule of lenity applicable." *Smith v. United States*, 508 U.S. 223, 239 (1993). The words of the statute, the canons of statutory construction, the

legislative history surrounding the statute, and the purpose of the statute all support the disjunctive interpretation.

Section 3553(f) addresses when a defendant is eligible for relief from a statutory minimum sentence. Section 3553(f)(1) contains a list of certain prior offenses that a defendant must *not* have to qualify for the safety valve. A defendant satisfies § 3553(f)(1), and thus may be eligible for safety-valve relief, only if he does not have (A), he does not have (B), *and* he does not have (C). Said another way, a defendant who meets any one of subsections (A), (B), or (C) does not qualify for safety-valve relief.

## CONCLUSION

The district court properly denied Mr. Pace's motion to suppress. Officer Crowder had reasonable articulable suspicion to detain him and search his vehicle under the Fourth Amendment. Additionally, the district court properly found that Mr. Pace did not qualify for safety-valve relief. Therefore, the judgment of the district court is affirmed.

AFFIRMED

KIRSCH, *Circuit Judge*, concurring. I join the opinion but write separately to explain my understanding of 18 U.S.C. § 3553(f)'s safety valve. Section 3553(f)(1) is conjunctive, not disjunctive. The statute conjoins three separate conditions that the defendant must show he does not satisfy:

> [T]he court shall impose a sentence … without regard to any statutory minimum sentence, if the court finds at sentencing … that—(1) the defendant *does not have—(A)* more than 4 criminal history points, excluding any criminal history points resulting from a 1-point offense, as determined under the sentencing guidelines; *(B)* a prior 3-point offense, as determined under the sentencing guidelines; *and (C)* a prior 2-point violent offense, as determined under the sentencing guidelines[.]

18 U.S.C. § 3553(f) (emphases added). A conjunctive reading of "and" does not require us—as the dissent sees it—to read "and" as cumulative, joining the conditions together as if they had been bracketed. Rather, a conjunctive "and" can have a distributive or joint (cumulative) sense. Garner's Dictionary of Legal Usage 639 (3d ed. 2011); see *Scialabba v. Cuellar de Osorio*, 573 U.S. 41, 71 (2014) (how "and" works in 8 U.S.C. § 1153(h)(3) "depends, like many questions of usage, on the context"). Applied to § 3553(f)(1), the distributive "and" requires the defendant to show that he does not have (A), does not have (B), and does not have (C), not the combination of [(A) joined with (B) joined with (C)].

It is our job to decide from plain meaning and context whether "and" is distributive or joint. See *OfficeMax, Inc. v. United States*, 428 F.3d 583, 600 (6th Cir. 2005) (Rogers, J.,

dissenting) ("Whether to interpret the preceding words as distributed over the conjoined elements or not depends on the context of the sentence, and what we externally know about the conjoined elements."). Here, the context is a checklist of conditions. In a list like this, the plain meaning is that the defendant must satisfy all three negative requirements individually, not cumulatively. Plain readers naturally distribute the "does not have" in § 3553(f)(1). The three conditions do not jump out as joint (combining (A), (B), and (C)). That's why the Ninth Circuit had to provide readers the word "cumulatively": "This structure requires a defendant to prove that he or she does not meet the criteria in subsections (A), (B), and (C), *cumulatively*." *United States v. Lopez*, 998 F.3d 431, 436 (9th Cir. 2021).

I recognize that in this statute and others like it, a distributive reading makes "and" interchangeable with a disjunctive "or." But Congress writes statutes like that all the time, and for those statutes "courts have generally said ['and' and 'or'] are interchangeable and that one may be substituted for the other."[*] Conjunctive and Disjunctive Words, 1A Sutherland Statutory Construction § 21:14 (7th ed.); see *Peacock v. Lubbock Compress Co.*, 252 F.2d 892, 893 n.1 (5th Cir. 1958) ("The words

---

[*] The dissent somehow reads this sentence as "lead[ing] us down a dangerous path … of construing statutes to conform to what we judges think Congress 'really' meant, rather than to follow the words that Congress actually used." *Post* at 48. But this concurrence lays no such path. Consulting Congress's use of language in other statutes is an ordinary tool of statutory interpretation. See *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 448 n.3 (2006) (looking "elsewhere in the United States Code" to aid statutory interpretation).

'and' and 'or' when used in a statute are convertible, as the sense may require."). Here's one example:

> (b) Exemptions.—This chapter does not apply to—
>
> (1) a contract of the Federal Government or the District of Columbia for the construction, alteration, or repair, including painting and decorating, of public buildings or public works;
>
> (2) any work required to be done in accordance with chapter 65 of this title;
>
> (3) a contract for the carriage of freight or personnel by vessel, airplane, bus, truck, express, railway line or oil or gas pipeline where published tariff rates are in effect;
>
> (4) a contract for the furnishing of services by radio, telephone, telegraph, or cable companies, subject to the Communications Act of 1934 (47 U.S.C. 151 et seq.);
>
> (5) a contract for public utility services, including electric light and power, water, steam, and gas;
>
> (6) an employment contract providing for direct services to a Federal agency by an individual; *and*
>
> (7) a contract with the United States Postal Service, the principal purpose of which is the operation of postal contract stations.

41 U.S.C. § 6702(b) (emphasis added). Had Congress used "or" instead of "and," this distributive list would mean

exactly the same thing. It certainly cannot be that the only contract exempted by 41 U.S.C. § 6702(b) is an employment contract of the federal government or D.C. with USPS providing for direct services to a federal agency by an individual for the carriage of freight or personnel, for the furnishing of telecommunication services, and for public utility services. There's no contract in America that satisfies all those conditions. Yet the dissent's bracketing approach would exempt only such a super-contract. But everyone intuitively knows that Chapter 67 of Title 41 ("this chapter") "does not apply" to any contract that satisfies any of the six enumerated criteria. The statutory reader distributes the "does not apply."

There are numerous other examples in the federal code. Take 18 U.S.C. § 845(a), which lists seven exceptions to federal crimes about explosive materials. If the dissent's cumulative "and" were forced into the statutory list, § 845(a) would create a single exception with seven requirements: only the regulated transportation of military small-arms explosives that are used in medicines, antique devices, and tribal fireworks displays would be exempted. See also 26 U.S.C. § 9831(a) (chapter would be inapplicable only to governmental group health plans with fewer than two participants); 41 U.S.C. § 8302(a)(2) (section would be inapplicable only to articles, materials, or supplies for use outside the United States, procured by a reciprocal defense procurement memorandum of understanding that is also somehow a contract with an award value that is not more than the micro-purchase threshold under 41 U.S.C. § 1902). And sometimes Congress uses "or" instead of "and" to mean the same thing. See, e.g., 7 U.S.C. § 138a(e) ("or" could be changed to "and" with no semantic shift); 46 U.S.C. § 3202(d) (same).

The dissent concedes that, in these examples, "whether the list ends with 'and,' 'or,' or nothing makes no difference." *Post* at 48. Still, it finds them inapposite, reasoning that, unlike § 3553(f)(1), "[t]here is nothing cumulative about the items" on these "simple list[s]" expressed in these other statutes because "they do not work together to establish criteria." *Post* at 49. But this circular reasoning assumes its conclusion: that the list in § 3553(f)(1) is cumulative. Instead of these examples, the dissent favors two of its own, one from 41 U.S.C. § 6702(a) and another about a teenager seeking a driver's license. Yet Congress would need to rewrite § 3553(f)(1) before these could aid our interpretation. Take the dissent's driver's license example. The dissent frames eligibility as requiring three "must haves": the person "must have attained a specified age (say, 16 years), … must be able to pass the vision test, *and* … must be able to pass the road test." *Post* at 49. But the safety valve eligibility requires a defendant "not have" three things. A better framing for the dissent's example would be: "Under Illinois law, anyone is eligible to drive who does not have—(A) an age below 16 years old; (B) inadequate vision (as assessed by the required vision test); and (C) inadequate road safety skills (as assessed by the required road test)." It's clear that a person's eligibility to drive turns on them not being under 16 years old, not having inadequate vision, and not lacking adequate road safety skills. The reader naturally distributes the phrase "does not have" to each of the three lettered conditions. No one would suggest that this law would authorize a 12 year old with perfect vision and road-safety skills to drive.

The government has provided a common-sense approach that I include here in full:

In other contexts, statements with the form "You must not A and B" have a different meaning—a meaning that still uses the word "and" in the conjunctive, but that distributes the prefatory phrase "you must not" individually to each item that follows. Take the advice: "To be healthy, you must not drink and smoke." This directive also shares the form "You must not A and B." But a reasonable listener would understand it, in context, to mean that he must refrain not merely from drinking and smoking in combination, but also from engaging in either activity in isolation. The listener would reasonably distribute the prefatory phrase "you must not" to each item individually, even though the phrase is not repeated. Or, to illustrate the same point with parentheses, the listener would interpret the statement as: NOT (A) AND NOT (B).

Sometimes, a distributive reading offers the only natural interpretation of a statement. Imagine a public announcement states, "Under Florida law, every citizen is eligible to vote this November, but this rule does not extend to—(A) minors under the age of 18; (B) individuals who fail to register with the Secretary of State by the statutory deadline; and (C) convicted felons still serving their sentences." It is evident that a person's eligibility to vote hinges on not being a minor, not being an unregistered person, and not being a convicted felon. The reader should distribute the phrase "does not extend to" to each of the three lettered subparagraphs.

>No one would suggest that this announcement
>authorizes an unregistered 35-year-old prison
>inmate (much less every 6-year-old with an un-
>blemished rap sheet) to vote.

En Banc Brief for the United States in Support of Government Appeal at 19–20, *United States v. Garcon*, 2022 WL 831883 (11th Cir. March 14, 2022) (No. 19-14650-U).

The Eighth Circuit has gotten § 3553(f)(1) right. See *United States v. Pulsifer*, 39 F.4th 1018 (8th Cir. 2022). Finding § 3553(f)(1) obviously conjunctive because of the "and," the court held that § 3553(f)(1)'s "text distributes the introductory phrase 'does not have' across each statutory condition" and "serves as an eligibility checklist for offenders who seek to avail themselves of the limitation on statutory minimums." *Id.* at 1022. Meanwhile, the Eleventh Circuit had changed "and" to "or," meaning defendants are ineligible for the safety valve if they satisfy statutory condition (A) or (B) or (C). See *United States v. Garcon*, 997 F.3d 1301, 1305 (11th Cir. 2021), reh'g en banc granted, opinion vacated, 23 F.4th 1334 (11th Cir. 2022). This ineligibility checklist is the opposite framing—though the same result—of the Eighth Circuit's eligibility checklist.

One last observation. The dissent notes that Congress could have made this whole thing easier by using "or" in the first place. But even "or" is not rock solid: Pace would argue that he was eligible for the safety valve because he didn't satisfy one of the three conditions. His theory would be that "or" means he has to prove only that he does not have one of A *or* B *or* C. As I see it, Congress could have drafted this statute using no connecting word at all, e.g.:

> [T]he court shall impose a sentence … without regard to any statutory minimum sentence, if the court finds at sentencing … (1) the defendant does not have—
>
> > (A) more than 4 criminal history points, excluding any criminal history points resulting from a 1-point offense, as determined under the sentencing guidelines;
> >
> > (B) a prior 3-point offense, as determined under the sentencing guidelines;
> >
> > (C) a prior 2-point violent offense, as determined under the sentencing guidelines.

I bring this up to note that regular readers do not even process the word "and" or "or" in a checklist like this or an exemption list like 18 U.S.C. § 845(a). Regardless of which word is used before the final item in the list or whether any word is used at all, we simply read each item as separately covered by the negative prefatory phrase.

Reading § 3553(f)(1) as a conjunctive "and" distributing "does not have" across all three statutory conditions, I agree with the result: A defendant is eligible for the safety valve only if, under the Guidelines, the defendant does not have more than four criminal history points, does not have a prior three-point offense, and does not have a prior two-point violent offense. That's the plain reading in a statutory checklist context. Pace is therefore ineligible. The district court should be affirmed both on the denial of the motion to suppress and the application of the safety valve, so I join the opinion.

WOOD, *Circuit Judge*, dissenting in part. This case requires us to don the hat of an expert grammarian employed by a legislative drafting office in order to determine whether Roger Pace was eligible for relief from the five-year mandatory minimum sentence that applied to his drug crime. My colleagues ably set out the facts and procedural history of the case, which presents two questions: whether the district court correctly denied Pace's motion to suppress, and whether it properly read the so-called safety-valve statute, 18 U.S.C. § 3553(f), for sentencing purposes. I agree with their disposition of the suppression motion, and so I join Part II.A. of the opinion. Regrettably, however, I am not persuaded that their reading of section 3553(f) is correct. For the reasons I explain here, I believe that the district court had the authority to impose a sentence less than the five-year statutory minimum, see 21 U.S.C. § 841(b)(1)(B)(viii), and so I would remand to allow the district court to exercise that discretion.

Like the majority, I begin with the language of the safety-valve statute:

> (f) Limitation on applicability of statutory minimums in certain cases.—Notwithstanding any other provision of law, in the case of an offense under section 401, 404, or 406 of the Controlled Substances Act (21 U.S.C. 841, 844, 846), … the court shall impose a sentence pursuant to guidelines promulgated by the United States Sentencing Commission under section 994 of title 28 without regard to any statutory minimum sentence, if the court finds at sentencing, after the Government has been afforded the opportunity to make a recommendation, that—

> (1) the defendant does not have—

(A) more than 4 criminal history points, excluding any criminal history points resulting from a 1-point offense, as determined under the sentencing guidelines;

(B) a prior 3-point offense, as determined under the sentencing guidelines; *and*

(C) a prior 2-point violent offense, as determined under the sentencing guidelines;

(2) the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;

(3) the offense did not result in death or serious bodily injury to any person;

(4) the defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines and was not engaged in a continuing criminal enterprise, as defined in section 408 of the Controlled Substances Act; *and*

(5) not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

Information disclosed by a defendant under this subsection may not be used to enhance the sentence of the defendant unless the information relates to a violent offense.

18 U.S.C. § 3553(f) (emphasis added).

The critical part for Pace's case is subsection 1, which sets out three criteria that disqualify a defendant from safety-valve eligibility. Those items—subparts (A), (B), and (C)—are linked by the word "and." In everyday English, the word "and" is a conjunction that signifies that all items in a list are included; we contrast it with the conjunction "or," which has a disjunctive meaning—any one item on the list will suffice. It is painfully obvious that Congress did not use the word "or" to connect the three subparts of section 3553(f)(1). A defendant is disqualified, therefore, only if the defendant meets all three criteria of subpart (1) (as well as the requirements in subparts (2) through (5) of section 3553(f)). Whether wisely or foolishly, Congress used the word "and," and as judges it is our duty to apply the law as it is written.

My colleagues strain against that normal English understanding of "and." They offer several reasons for their conclusion that, in this part of this statute, the word "and" actually means "or." They fear that the conjunctive reading (*i.e.* the one that requires a defendant to meet all three of the criteria) would render part of the statute superfluous; that it would lead to absurd results; and they insist that the "distributive reading" must reflect what Congress "really" intended (*i.e.*, a disjunctive list in which the final connector must be read as an "or" even though it says "and.")

I see no need for these contortions. First, as long ago as 1978, the Supreme Court held that the courts must follow statutory language, even if they think that the results would be absurd or wildly out of proportion to the goals that Congress has articulated. It did so in *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 173 (1978), in which it had to decide whether the Tennessee Valley Authority (TVA) would be in violation of the Endangered Species Act if the agency completed and then operated a dam that would lead to the extinction of a small fish known as the snail darter. Despite the millions of dollars that had been sunk into the dam project—dollars appropriated by Congress, no less—the Court found no applicable exception to the Act's requirements. "To sustain that position," Chief Justice Burger wrote, would "force[] [the Court] to ignore the ordinary meaning of plain language." *Id.* Later in the same opinion, he said that the Court was being "urged to view the Endangered Species Act 'reasonably,' and hence shape a remedy 'that accords with some modicum of common sense and the public weal.' But is that our function? … Congress has spoken in the plainest of words … ." *Id.* at 194.

The same is true here. Importantly, there is no need to turn, as the concurrence implicitly does, to the arcane grammatical concept of the "conjunctive negative proof" in order to read this statute. That is necessary only if one needs to disambiguate something, but no such task lies before us—the plain language suffices. I cannot agree that the word "and" is so esoteric that judges are unable to give it its normal meaning. If I order ham and eggs for breakfast, then I assume that the plate will contain some ham and some eggs, not just one or the other. If I tell the wait staff that I do not want mustard and pickles on my Impossible burger, the server knows not to

bring a burger with just mustard, or a burger with just pickles. My request, in brief, is conjunctive.

For what it's worth, my view is entirely consistent with the discussion of the "negative proof" offered by Scalia and Garner in their book *Reading Law: The Interpretation of Legal Texts* (2012). At page 120, they begin their discussion of the negative proof with a table showing the conjunctive and disjunctive variants:

| Conjunctive | Disjunctive |
| --- | --- |
| To be eligible, you must prove that you have not A, B, and C. | To be eligible, you must prove that you have not A, B, or C. |

All they have to say about the conjunctive proof, which our statute exemplifies, is this: "With the conjunctive negative proof, you must prove that you did not do all three." Scalia & Garner, *supra*, at 120. One might wonder whether they mean all three simultaneously, or all three at any time, but the next sentence on the disjunctive proof answers the question. "With the disjunctive proof, … [i]f you prove that you did not do one of the three things, are you eligible?" They answer that question "no"—the person must have done none of these things. *Id.* There would be no difference between the conjunctive and disjunctive versions of this proof if the person also had to prove that he had done neither A, nor B, nor C. The only way in which the conjunctive proof does any work is if all three things must exist together—that is, the example should be understood this way: "To be eligible, you must prove that you have not [A, B, and C]."

As applied to our case, this means that unless the defend-
ant meets all three criteria set forth in subsections
3553(f)(1)(A) through (C), the defendant is eligible to move on
and attempt to satisfy the remainder of the statutory require-
ments. If the record shows, for instance, that the defendant
has six criminal history points but has never committed a
three-point offense and has never committed a two-point vio-
lent offense, then safety-valve relief is still available. The same
would be true if the defendant has four criminal history
points (satisfying (A)), and a prior three-point offense (satis-
fying (B)), but no two-point violent offense.

This is a straightforward reading of the statute. It also has
the virtue of consistency with Congress's purpose in enacting
the safety-valve provision. Recall that the original version of
18 U.S.C. § 3553(f) was available only to defendants who did
not have more than one criminal history point. As our col-
leagues in the Ninth Circuit recognized, "[t]he low threshold
of more than one criminal history point resulted in many drug
offenders receiving mandatory-minimum sentences in in-
stances that some in Congress believed were unnecessary and
harsh." *United States v. Lopez*, 998 F.3d 431, 435 (9th Cir. 2021).
Concern over this regime increased with the passage of time.
In 2009, Congress directed the U.S. Sentencing Commission to
research federal mandatory-minimum sentencing provisions.
Cong. Research Serv., R41326, *Federal Mandatory Minimum
Sentences: The Safety Valve and Substantial Assistance Exceptions*
1 (July 5, 2022). In response to significant support among fed-
eral judges and the general public for reforms to the safety-
valve exception, the Commission recommended that Con-
gress expand its scope. *Id.* Congress followed that recommen-
dation in the First Step Act of 2018, which amended section

3553(f) in a way designed to make it available to more defendants.

We do no violence to the statute when we read it in a manner that is consistent with this congressional purpose. The straightforward reading (*i.e.*, "and" means "and," not "or") does not raise any of the problems about which the majority is concerned—certainly not in a significant enough way to justify overriding the language that Congress chose. I note as well that there is no need to reach conjunctive negative proofs and other such esoterica if we follow the plain language of the statute. The words mean what they mean, whether or not we like the outcome.

*Surplusage.* The majority begins with its concern about surplusage, and so I will start there, too. It posits that the conjunctive reading ("and" means "and") and the disjunctive reading ("and" means "or") "are not equally plausible" and it is the latter reading that is preferable because "[t]he conjunctive argument creates more problems than solutions and renders a portion of the statute superfluous." *Ante* at 21. It goes on to posit that "[i]f a defendant meets subsection (B) requiring a three-point offense, and subsection (C) requiring a two-point violent offense, then he would automatically have more than the four criminal history points required by subsection (A). This interpretation of the statute therefore cannot be squared with the canon against surplusage." *Id.*

But, even putting to one side that the statute is doing real work any time the two-point offense is not for a crime of violence, and any time the defendant does not have a three-point offense, the surplusage problem the majority fears goes away when we look at the statute more closely.

Subpart (A) speaks of criminal history *points*, while subparts (B) and (C) are phrased in terms of *offenses* that are assigned a certain number of criminal history points by the Sentencing Guidelines. See generally U.S.S.G., Chapter 4, Criminal History and Criminal Livelihood. The focus in subpart (A) on criminal history points as determined by the Sentencing Guidelines has consequences. Criminal history points are based on past sentences, but not all past sentences generate points. So, for example, under U.S.S.G. § 4A1.2(e), the Guidelines count only a "prior sentence of imprisonment exceeding one year and one month that was imposed within fifteen years of the defendant's commencement of the instant offense … ." There are other similar limitations, and defendants receive a reduced number of points for certain juvenile offenses. *Id.* § 4A1.2(d).

In contrast, subparts (B) and (C) of the safety valve focus directly on offenses, using a short-hand that generically correlates offense severity with criminal history points. Nothing suggests that an offense would not satisfy (B) or (C) because it was committed 20 years ago, for example. Those subsections look to past offenses, not the number of criminal history points ultimately assigned.

With this distinction in mind, it is not hard to imagine situations in which the conjunctive reading does not render subpart (A) superfluous. Here are a few examples:

- A defendant who finished serving a sentence for a two-point violent offense 11 years ago, thus satisfying subpart (C), and who has a more recent three-point nonviolent offense (satisfying (B)), would not satisfy (A). His "criminal history points … as determined under the sentencing

guidelines" would be three, because the guide-lines instruct that two-point or lower sentences older than 10 years should not be included in the criminal history points calculation. See *Id.* §§ 4A1.2(e)(2), (3).

- Similarly, a defendant who finished serving a sentence for a three-point offense 21 years ago (satisfying (B)) and a two-point violent offense last year (satisfying (C)), would not satisfy (A). His "criminal history points … as determined under the sentencing guidelines" would be two, because the guidelines instruct that no sentence older than 15 years should be included in the calculation. See *Id.* §§ 4A1.2 (e)(1), (3).

- To the same effect, a defendant who committed a three-point offense (satisfying (B)), and a two-point violent offense adjudicated by a tribal court (satisfying (C)), would not satisfy (A). His "criminal history points … as determined under the sentencing guidelines" would be three be-cause the guidelines instruct that points result-ing from tribal court convictions be excluded. See *Id.* § 4A1.2(i).

These are only a few of the examples one can imagine. Many others could arise under plausible readings of the exclusions found in sections 4A1.2(c) through (k) of the Guidelines.

At a minimum, this shows that it is not accurate to assume that any defendant who satisfies (B) and (C) would *automatically* have more than four criminal history points. This be-comes clear when one accounts for the distinction between

offenses and points, and also appreciates that Congress used that distinction with precision in the safety-valve statute.

One cannot rescue the claim of surplusage by treating offenses that the guidelines do not include in the criminal history-score calculation as zero-point offenses that do not satisfy either (B) or (C). Doing so would be inconsistent with the structure of Chapter 4. It *first* assigns points to offenses based on the length of the sentence, U.S.S.G. § 4A1.1. Only after that does it specify which sentences should be counted and which should be excluded. *Id.* § 4A1.2(c). It makes no sense to say that a three-point offense suddenly ceases to be a three-point offense just because a different provision of the Guidelines requires it to be excluded for some reason.

Congress had good reason to write the safety-valve statute this way. It achieves a coherent policy objective—that is, categorically to exclude violent recidivists with recent criminal history from safety-valve eligibility. It does so with careful attention to the structure of Chapter 4. And there is nothing incongruous about the policy goal. Congress sensibly could have thought that in cases that meet the other criteria of section 3553(f), when the defendant is not a violent recidivist, judges should have the leeway to go below a statutory minimum. Such a view would be consistent with other parts of the First Step Act, which limits mandatory minimums in several ways. See, *e.g.*, *Deal v. United States*, 508 U.S. 129, 131 (1993) (construing the pre-First Step Act version of 18 U.S.C. § 924(c)(1) to require the stacking of mandatory minimums for second or subsequent offenses charged in the same case); *United States v. Davis*, 139 S. Ct. 2319, 2324 n.1 (2019) (recognizing that *Deal* was abrogated by the First Step Act, which stipulates that only a second section 924(c)(1) violation

committed after a prior conviction under that statute becomes final will trigger the mandatory minimum).

I recognize that the reading of section 3553(f)(1) that I propose is not the same as the one adopted by the Ninth Circuit in *Lopez, supra*, 998 F.3d 431, even though I come to the same ultimate result. We begin, however, at the same point: the word "and" in the statute must carry its ordinary conjunctive meaning. *Id.* at 436. And, as I explain below, we agree that section 3553(f)(1) is "a conjunctive negative proof," *id.*, pursuant to which the defendant must prove that he or she "did not have" any one of the items listed in (A), (B), and (C) to be eligible.

The Ninth Circuit's answer to the superfluity concern, however, was different from mine. It noted (and I agree) that each of the subparts of section 3553(f)(1) has a different purpose. *Id.* at 439. Next, it addressed the government's argument that anyone who satisfies subpart (B) (three-point offense) as well as subpart (C) (two-point violent offense) will automatically have more than four criminal history points and thus (A) would not be doing any work. I have already provided my answer to this argument (*i.e.*, not all offenses result in points). The Ninth Circuit gave a different one. It noted that the canon against surplusage is "just a rule of thumb," *id.* at 441, which "does not supersede a statute's plain meaning and structure." *Id.* And it pointed out that "a defendant who has only one three-point violent offense under the Sentencing Guidelines … would have (B) a 'prior 3-point offense' and (C) a 'prior 2-point violent offense' but would have only three criminal-history points, *not* (A) 'more than 4 criminal history points.'" *Id.* at 440.

I have no reason to disagree with the Ninth Circuit's con-
clusion that a three-point violent offense might simultane-
ously qualify as a three-point offense for purposes of subpart
(B) and a two-point violent offense for purposes of subpart
(C), and that it would leave the defendant below the threshold
specified in subpart (A). But this is not the best answer to the
claim of surplusage. It seems more likely that Congress in-
cluded subpart (A) in the First Step Act's revision of the
safety-valve statute because it did not want eligibility to be
stripped from defendants on the basis of convictions that are
decades old. Requiring at least four criminal history points
achieves that end.

*Absurd results*. The majority is also concerned that the con-
junctive reading of section 3553(f)(1) inevitably leads to ab-
surd results. It argues that:

> … Mr. Pace's interpretation of the statute produces
> absurd results. A defendant who had multiple
> three-point violent offenses under subsection (B)
> would still be safety-valve eligible so long as he did
> not have a prior two-point violent offense under
> subsection (C). This interpretation would afford le-
> niency to defendants with more serious offenses
> (those serious enough to receive three criminal his-
> tory points) while denying safety-valve eligibility
> to the defendants with less serious offenses that re-
> ceived only two points.

*Ante* at 23–24. With respect, I am not troubled by this aspect
of the statutory scheme.

In my view, there is nothing absurd about treating violent
offenders who served shorter sentences differently from

nonviolent offenders who served longer ones. Many laws do just that. The Armed Career Criminal Act, for instance, treats felons with a history of "violent felonies" more harshly than defendants without a history of violence (setting aside those with a history of controlled-substance offenses), even when the nonviolent defendants have served longer sentences. And, as the Ninth Circuit observed, it makes the most sense to read the third criterion as imposing a two-point floor on the offense, not a two-point floor *and* ceiling. The rest of the safety-valve statute puts special weight on violent crime, stripping defendants of eligibility if the offense of conviction resulted in "death or serious bodily injury," 18 U.S.C. § 3553(f)(3), or if the defendant used "violence or credible threats of violence" or a firearm "in connection with the offense." *Id.* § 2. Given the extremely harsh sentences that for years have been imposed for nonviolent drug crimes—a history the First Step Act aimed to correct or at least ameliorate—it is no surprise that the Act shifted the focus of sentencing judges away from the *length* of past sentences and toward the underlying *substance* of the past crimes.

*The Use of an Em-Dash.* The majority turns to the use of an "em-dash" at the top of the list that appears in section 3553(f)(1) to support its interpretation. This, it argues, supplies a textual basis for the "distributive" reading that the concurrence advocates. The use of the em-dash could be seen as a signal that Congress "distributed" the introductory phrase "does not have" across each statutory condition. *Id.* And indeed, this is the way that the Eighth Circuit reads the statute. See *United States v. Pulsifer*, 39 F.4th 1018 (8th Cir. 2022).

But that argument falls apart upon closer examination. It does not reflect the way that the Senate drafts statutes, as one

can see by reference to the Senate's Legislative Drafting Manual. Section 321 of the Manual provides the following instructions for the formatting of "Items in a Series" (and note that the Manual illustrates its own principles):

> (a) LISTS.—
>
>> (1) FOLLOWING A DASH.—If a list is preceded by a dash—
>>
>>> (A) the item is subdivided and its margin is indented;
>>>
>>> (B) the first word in each item in the list is lower case (unless a proper noun);
>>>
>>> (C) each item (other than the last item) ends with a semicolon; and
>>>
>>> (D) the conjunction "and" or "or" appears at the end of the next-to-last item only.

Section 3553(f)(1) follows these rules to a "T". Moreover, as subsection (D) of the Senate's rule makes clear, its drafting practices recognize the standard meaning of the word "and."

Given the style rules—rules that are scrupulously enforced by the Senate's Legislative Counsel—the only responsible thing to do is to recognize that the em-dash has no meaning, distributive or otherwise. What does matter is the conjunction at the end of the list. That conjunction (in our statute, "and") is what dictates whether all of the items must be present, or whether the list is in the disjunctive.

*The Distributive Reading.* This is the place where the concurring opinion has put its money, despite its admission that "in this statute and others like it, a distributive reading makes 'and' interchangeable with a disjunctive 'or.'" *Ante* at 27. It

brushes off this concern, however, with the comment that
Congress "writes statutes like that all the time." *Id.* This, in
my view, overstates matters considerably and leads us down
a dangerous path—one that the Supreme Court has repudi-
ated—of construing statutes to conform to what we judges
think Congress "really" meant, rather than to follow the
words that Congress actually used. See *Oklahoma v. Castro-
Huerta*, 142 S. Ct. 2486, 2496 (2022) ("The Court may not 're-
place the actual text with speculation as to Congress' intent.'
Rather, the Court 'will presume more modestly' that 'the leg-
islature says what it means and means what it says.'") (inter-
nal citations omitted); *Bostock v. Clayton County*, 140 S. Ct.
1731, 1754 (2020) ("Judges are not free to overlook plain stat-
utory commands on the strength of nothing more than sup-
positions about intentions or guesswork about expecta-
tions."); see also Scalia & Garner, *supra*, at 57 (arguing that to
permit the alleged purpose of a statute to override its clear
text "is to provide the judge's answer rather than the text's
answer to the question").

Worse, the concurrence has disregarded the distinction
between a simple list of examples and a list of criteria. The
statutes that the concurrence cites all take this form: "This
chapter shall not apply to [a list of terms A, B, and C]." In that
setting, whether the list ends with "and," "or," or nothing
makes no difference. Thus, looking at 41 U.S.C. § 6702(b), one
of the examples cited in the concurrence, we find this intro-
ductory language: "This chapter does not apply to [any of the
seven different things listed]." *Ante* at 27–28. Interestingly, the
previous subsection of the very same statute provides an ex-
ample of criteria that must be met, and it uses the word "and"
cumulatively:

> This chapter applies to any contract or bid specifi-
> cation for a contract whether negotiated or adver-
> tised that—(1) is made by the Federal Government
> or the District of Columbia; (2) involves an amount
> exceeding $2,500; and (3) has as its principal pur-
> pose the furnishing of services in the United States
> through the use of service employees.

41 U.S.C. § 6702(a). No one would say that it is enough that
the contract was made by the federal government, or that it is
enough that it involves an amount exceeding $2,500, or that it
has the required principal purpose. All three criteria must be
met, which is why Congress used the word "and."

The same is true of the other examples cited in the concur-
ring opinion. The statute setting out exceptions to federal
crimes about explosive materials, 18 U.S.C. § 845(a), sets out a
simple list. There is nothing cumulative about the items on
that list, and importantly, they do not work together to estab-
lish criteria that must be met before the exception will apply.
The same is true of the Tax Code's list of exceptions for certain
health plans, 26 U.S.C. § 9831(a), and the Buy-America rules
found in 41 U.S.C. § 8302(a)(2). In contrast, think of the rules
that govern one's ability to obtain a driver's license: the per-
son must have attained a specified age (say, 16 years), *and* the
person must be able to pass the vision test, *and* the person
must be able to pass the road test. These are criteria, not a list
of examples, and one alone will not suffice. A 17-year-old who
has uncorrectable 20/300 vision may not drive, period.

*The "Conjunctive Negative Proof."* Another argument that
may have some superficial appeal, but that breaks down on
closer examination, rests on the idea of the "conjunctive neg-
ative proof." I have already addressed this, but a few

additional words are in order. To reiterate, let's say that section 3553(f)(1) has a structure that *Reading Law* calls the "conjunctive negative proof." See Scalia & Garner, *supra*, at 120. That structure lends support to Pace's reading, not the government's, as the Ninth Circuit has explained. See *Lopez*, 998 F.3d at 437.

A negative proof, according to Scalia and Garner, is a statutory structure that takes this form: "To be eligible, you must prove that you have not A, B, _____ C." Scalia & Garner, *supra*, at 120. A *conjunctive* negative proof is one that fills the blank before item C with "and"; a *disjunctive* negative proof is one that fills it with "or." *Reading Law* devotes several paragraphs to the *disjunctive* structure, which is common in both law and daily usage. Scalia and Garner's takeaway about that structure's meaning is best illustrated by the example they give: a citizenship applicant required by statute to prove that she has not previously "(1) been convicted of murder; (2) been convicted of manslaughter; *or* (3) been convicted of embezzlement" must prove that she "has done none" of those things before she can naturalize. *Id.* Put another way, if she has been convicted of any one of the three listed offenses, she loses her eligibility to naturalize.

*Reading Law* has much less to say about the rarer conjunctive form of the negative proof—the form that concerns us here. In fact, it gives us just one sentence to go on: "With the conjunctive negative proof, you must prove that you did not do all three." *Id.* As I observed earlier, that maxim leaves open the question whether all three conditions must exist at once (*i.e.*, do they count only if all three are present, and one alone does not suffice) or whether the language must be read some other way. To set the record straight: a conjunctive negative

proof renders the subject ineligible for the benefit in question if and only if she flunks *all* of the proof's requirements.

Start with an intuitive example: "To be acquitted of Operating while Intoxicated, you must prove that you did not drink and drive." All would agree that drinking and driving are both fine on their own—it's the *combination* of the two that precludes acquittal. Similar two-condition examples abound in common parlance:

- "To be acquitted of theft by fraud, you must prove that you did not dine and dash."

- "To be acquitted of distracted driving, you must prove that you did not text and drive."

English speakers will have no trouble interpreting these examples in a manner consistent with my view of the safety valve, and Scalia and Garner would classify each as a two-condition conjunctive negative proof. Intuitions may be less clear when we turn directly to section 3553(f)(1) because conjunctive negative proofs that, like the statute, have more than two conditions occur more rarely. (This is no doubt because the verbs tending to accompany such constructions—"mix," "combine," "blend," "fuse," and so on—suggest the conjunctive meaning themselves). Still, one can think of coherent examples where the structure alone conveys the conjunctive meaning. To name one, a doctor lecturing about a lethal three-way drug interaction might say: "To disqualify accidental poisoning as the cause of death, you must establish that the patient did not take drug X, drug Y, and drug Z." Each of those drugs might be fine if taken alone, but if all three are taken together there might be a toxic interaction.

The rarity of examples involving multiple conjunctive conditions does not change the key point, which is that the conjunctive negative proof is—as the name suggests—conjunctive. Whatever the number of terms, the structure has the same logical upshot: the conditions that may preclude eligibility do so only when they exist jointly.

                                *   *   *   *

Congress is the master of the statutes it passes, and it is not for us to assess their wisdom. There is nothing irrational, absurd, superfluous, or otherwise faulty about applying section 3553(f)(1) straightforwardly, allowing the word "and" to mean "and," and observing the distinctions drawn in the Sentencing Guidelines between offenses and the number of criminal history points that are countable. I therefore respectfully dissent from Part II.B. of the majority's opinion.