In the

# United States Court of Appeals

## For the Seventh Circuit

No. 18-2212

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JACOB D. LICKERS,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 4:16-cr-40011 — **Sara Darrow**, *Chief Judge*.

ARGUED APRIL 8, 2019 — DECIDED JUNE 27, 2019

Before WOOD, *Chief Judge*, and SCUDDER and ST. EVE, *Circuit Judges*.

SCUDDER, *Circuit Judge*. Jacob Lickers received a sentence of 132 months' imprisonment and a lifetime of supervised release for possessing child pornography. Cases like these often arise from undercover law enforcement activity on the Internet. Not this case. Two narcotics officers visited a park in Monmouth, Illinois, as part of undercover drug work. They unexpectedly observed Lickers sitting alone in a parked car

under a tree while looking at his phone and watching a family with young children on a nearby playground, later discovering that he was engaging in indecent sexual conduct. On appeal Lickers contends that the police's encounter with him in the park and the subsequent search of his phone and laptop computer violated the Fourth Amendment. He also challenges the life term of supervised release imposed by the district court. We affirm.

**I**

On the afternoon of September 3, 2015, Jacob Lickers sat alone in his car, parked in the grass under a group of trees in Monmouth Park. Two undercover police officers dressed in civilian clothes, in the park to meet a confidential drug source, noticed Lickers and found his behavior odd. He appeared excited, repeatedly looking toward the passenger seat, down at his lap, and then at a family with young children on a nearby playground. On their second and third rounds through the park, the officers again passed Lickers and observed the same behavior. On their final pass they called dispatch to run the car's Colorado license plate.

The officers parked and continued to watch Lickers, at one point thinking that he may be a drug user because his movements reflected the tweaking commonly exhibited by someone craving methamphetamine. The officers decided to approach Lickers's car and start a conversation, including by offering to sell drugs. Upon doing so, Inspector Jimmy McVey saw that Lickers had a small towel covering his lap, which he kept putting his hands under, and a cellphone on the passenger seat. At that point, the second officer, Inspector Ryan Mar-

icle, addressed Lickers by his first name, to which Lickers responded by asking if the two men were police officers. The officers so confirmed and displayed their badges.

Lickers's demeanor then changed. He became noticeably nervous, began breathing heavily, and sought to knock his cellphone off the seat to the floor of the car. He also kept placing his hands under the towel on his lap. Inspector McVey reacted by asking Lickers for his driver's license, which Lickers provided. McVey then radioed Lickers's information to dispatch and asked for a patrol car to come to the park.

Over the next minute or so, and despite the officers' repeated requests to keep his hands visible and out in the open, Lickers continued placing his hands under the towel on his lap. Concerned that Lickers may be concealing a weapon, Inspector Maricle directed him to remove the towel. Lickers did so, exposing his genitals. When Inspector McVey asked Lickers what he was doing, Lickers said he was looking at the website Craigslist on his phone and "self-pleasuring himself." He then immediately changed course, however, and insisted that he was urinating in a cup, despite the presence of a nearby public restroom.

Skeptical of the new explanation, Inspector McVey asked Lickers if he was viewing pornography on his phone while watching the family with children on the playground. Lickers had no response. At that point, McVey ordered Lickers to pull up his pants and step out of the car. The moment Lickers opened the car door, Inspector McVey smelled marijuana. When Lickers denied McVey's request to search the car, the police radioed for a K9 unit to come to the park. The unit arrived about 20 to 30 minutes later, and a dog circled the car and alerted near the passenger door, at which point Lickers

admitted he had marijuana inside. The officers then found the marijuana and placed Lickers under arrest for drug possession. A subsequent, more thorough inventory search of the car resulted in the officers recovering Lickers's cell phone, laptop computer, and digital camera.

Later the same day a state court judge approved a warrant authorizing a search of these devices. The search revealed sexually explicit videos of young children on Lickers's phone. Following his indictment on state drug and child pornography charges, Lickers moved to suppress not only the evidence recovered from his phone, but also the police's initial detention of him in the park, as well as the search of the car with the help of the K9 unit. The state court granted the motion, concluding that the police "lacked sufficient justification to remove the defendant from his automobile" as well as either reasonable suspicion or probable cause to detain him for 20 to 30 minutes while awaiting the K9 unit. Accordingly, the state court ordered suppressed "all physical evidence seized and statements of the defendant made after the arrival of the uniform[ed] officers [in the park]." A dismissal of all state charges against Lickers then followed.

Federal authorities entered the picture about three weeks later. It was then that the FBI sought a warrant to search Lickers's phone and laptop. The affidavit presented to the district court included a copy of the state search warrant application and disclosed that the prior search by state authorities uncovered child pornography on Lickers's phone. The district court issued the warrant, and the FBI's ensuing search of Lickers's phone found pornographic images and videos of very young children, including one video of a girl not even a year old.

A federal grand jury indicted Lickers for possessing and transporting child pornography. And Lickers again moved to suppress the evidence, arguing that his initial detention by the Monmouth police in the park and the subsequent search of his phone and computer by state and federal authorities violated the Fourth Amendment. The district court denied the motion, with then-Judge (now Chief Judge) Darrow reasoning that the officers' initial encounter with Lickers, including their request to see his driver's license, was consensual and therefore permitted under the Fourth Amendment. What the police observed "almost contemporaneously" from there, the district judge found, was "odd behavior" that continued and created the reasonable suspicion necessary to effect the seizure that occurred when the officers ordered Lickers out of his car. The district court placed particular emphasis on Lickers's effort to "toss the phone off the [car] seat" and his "continu[ing] to place his hands underneath the towel" after being told to keep his hands visible. "And then as soon as he removed the towel," the court added, the officers "certainly [had] reasonable suspicion" that "he was committing the offense of public indecency" in violation of Illinois law.

The district court also denied Lickers's motion to suppress that challenged the validity of the search warrant. Probable cause backed the searches of Lickers's phone and other devices, Judge Darrow explained, because the affidavit described Lickers engaging in indecent conduct while looking at the children on the playground and viewing Craigslist on his phone. While acknowledging this was "not the strongest case," the district court found the facts in the FBI agent's affidavit sufficient to establish probable cause as to the presence of child pornography on Lickers's phone.

The district court's ruling led in short order to Lickers pleading guilty to the federal charges while reserving his right to appeal the denial of his motion to suppress. The district court then sentenced Lickers to 132 months' imprisonment and a lifetime of supervised release. The court determined that the life term of supervision was warranted because of Lickers's acute need for treatment and the high risk that he would continue to pursue sexual interests in young children. At one point during sentencing, after highlighting the interest Lickers had expressed in instant messages in having sexual contact with infants and toddlers, the court emphasized that "it was just a matter of time before there was hands-on offenses."

## II

### A

The Supreme Court's 1968 decision in *Terry v. Ohio*, 392 U.S. 1, supplies the framework for evaluating the police's encounter with Lickers in Monmouth Park. If the police have reasonable suspicion to believe a crime has been committed, the Fourth Amendment permits brief detention to enable further investigation. See *id.* at 30; see also *United States v. Boden*, 854 F.2d 983, 992 (7th Cir. 1988) (explaining that "[a] *Terry* investigative stop is a brief detention which gives officers a chance to verify (or dispel) well-founded suspicions that a person has been, is, or is about to be engaged in criminal activity"). The validity of the so-called *Terry* stop turns on an objective assessment of the totality of the facts and circumstances. See *United States v. Brown*, 188 F.3d 860, 865–66 (7th Cir. 1999) (describing the *Terry* inquiry as "objective, not subjective").

The parties dispute when Lickers was no longer free to leave the park, for that moment defines when a seizure occurred within the meaning of the Fourth Amendment. See *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). Much turns on the answer. If Lickers is right that the police violated the Fourth Amendment from the get-go by approaching his car and asking for his driver's license, everything that followed, including the search of his car and ultimately of his phone, constituted the impermissible fruit of an unlawful detention. The government has a very different take on the facts. In its view, the officers' encounter with Lickers, including the request to see his driver's license, began as entirely consensual and proceeded from there only in response to conduct by Lickers himself that created the reasonable suspicion necessary to justify the police's every subsequent action.

Our own fresh look at the record shows that the government has the better of the arguments and, by extension, that the district court was right to reject Lickers's challenge to the police's initial detention of him in the park. See *United States v. Figueroa-Espana*, 511 F.3d 696, 701 (7th Cir. 2007) (explaining that we review a district court's legal determinations in a suppression hearing *de novo* and its factual determinations for clear error).

Start with the police's decision to approach Lickers in his parked car. That decision was the product of the officers' curiosity in response to what seemed like odd behavior. Lickers had parked in the grass, not in the parking lot, and his repeated tweaking left the officers, who were working a narcotics beat, the impression that drug activity may be afoot. Nor would it have been unreasonable for the officers (though they did not say so) to question whether Lickers needed medical

help. Faced with these circumstances, the officers were free to approach Lickers and peer into his car as part of trying to figure out what was going on, for it is well established that "[t]he Fourth Amendment is not triggered when law enforcement officers merely approach an individual in a public place and ask a few questions." *United States v. Douglass*, 467 F.3d 621, 623–24 (7th Cir. 2006).

Nor was there any Fourth Amendment infirmity in the officers asking Lickers for his driver's license. See *INS v. Delgado,* 466 U.S. 210, 216 (1984) (explaining that "interrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure"). The request was just that—officers asking, as they often do, for a driver's license—and the circumstances surrounding that request show that Lickers could have said no, told the police he wanted to leave the park, and then driven away. The encounter did not result from a traffic stop or some other interaction that left Lickers with no choice but to turn over his license. See *Florida v. Bostick*, 501 U.S. 429, 434–45 (1991) (explaining that "even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual, ask to examine the individual's identification" and no seizure occurs "as long as the police do not convey a message that compliance with their requests is required"); *Douglass*, 467 F.3d at 624 (finding no error with the district court's determination that no seizure occurred when the suspect "still could have declined to answer [the officers'] questions and driven away").

Other facts reinforce this conclusion. In particular, the district court was right to emphasize that Lickers, by saying yes to one request from the police (for his driver's license) but no

to others (to the later search of his car) shows that he remained free to make choices throughout his encounter with the police. That he chose to provide his driver's license did not convert his initial encounter with the police into an unlawful seizure.

Nor do the facts show that the officers asked for Lickers's license and then, without reason, held him in the park for an unreasonable period of time. See *United States v. Black*, 675 F.2d 129, 136 (7th Cir. 1982). To the contrary, what transpired "almost contemporaneously," as the district court found, was that Lickers's odd behavior continued from the moment the police identified themselves and asked him for his license. The police found Lickers with a towel covering his lap, seeking to prevent the officers from seeing his cell phone, and repeatedly moving his hands under the towel and refusing to keep them out in the open. These circumstances left the officers no way of knowing he was not hiding a firearm under the towel, so they were on solid ground asking him to remove it. Once Lickers did so and exposed himself, the officers were instantly able to connect other dots, including his focus on the family with kids and effort to conceal his phone, indicating that he may have been engaged in public indecency or posed some danger to children.

From there the analysis is even more straightforward. Upon smelling the marijuana emanating from Lickers's car, the police had ample cause to call the K9 unit to the park. See *United States v. Franklin*, 547 F.3d 726, 733 (7th Cir. 2008) ("A police officer who smells marijuana coming from a car has probable cause to search that car.") The K9 unit arrived without unreasonable delay (within approximately 20 to 30 minutes) and the dog's alert to the presence of drugs only reinforced the presence of probable cause authorizing the

search. See *Florida v. Harris*, 568 U.S. 237, 247 (2013) (explaining that a "court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search" a vehicle). And once the police found the marijuana, the law allowed the subsequent inventory search of the vehicle and thus the seizure of Lickers's cell phone and computer. See *United States v. McGuire*, 957 F.2d 310, 314–15 (7th Cir. 1992) (concluding that a full inventory search was authorized following the lawful recovery of drugs from a car). And, of course, all of these events occurred well before the Illinois legislature (in House Bill 1438) legalized recreational marijuana use effective January 1, 2020.

On this record, then, we agree with the district court that no aspect of the police's encounter with Lickers in Monmouth Park offended the Fourth Amendment. Having reached that conclusion, we proceed to Lickers's separate challenge to the state and federal warrants authorizing the search of his cell phone and computer.

B

Lickers's challenge to the search warrants raises a question that seems to be a first in our caselaw. We have before us a circumstance where federal agents sought and received a warrant by relying on facts supplied in, and evidence derived from, a prior state court warrant that, in our independent assessment, lacked probable cause. But now on appeal, in an effort to save the federal search, the federal government seeks protection under the good-faith exception of *United States v. Leon*, 468 U.S. 897 (1984). While we ultimately conclude that *Leon* applies, the analysis requires some unpacking.

The beginning point is the probable cause assessment. Probable cause exists when the circumstances "indicate a reasonable probability that evidence of a crime will be found in a particular location; neither an absolute certainty nor even a preponderance of the evidence is necessary." *United States v. Aljabari*, 626 F.3d 940, 944 (7th Cir. 2010). Where, as here, an affidavit serves to support a warrant, the controlling question is whether the affidavit contained sufficient facts "given the nature of the evidence sought and the crime alleged, [to] allow for a reasonable inference that there is a fair probability that evidence will be found in a particular place." *Id.* at 944–45.

With one substantial exception, the warrant affidavit submitted to the district court by the FBI agent mirrored the affidavit that Inspector Jimmy McVey of the West Central Illinois Task Force previously submitted to the Illinois court. Indeed, the federal reliance on the state search warrant application was so extensive that the FBI agent's affidavit expressly referenced the state application and attached a copy of Inspector McVey's affidavit. But the federal search warrant also went further by, most importantly, explaining that the initial search of Lickers's phone and computer by state authorities revealed a video showing a man sexually assaulting a girl no more than three years old. With this showing, the district court issued the warrant—an outcome everyone would have expected given the federal agent's pointing to the *known* presence of at least one child pornography video on Lickers's phone. Knowing something exists in a particular place conclusively satisfies the law's fair probability requirement.

Lickers does not disagree with these observations, but instead focuses our attention in the first instance on the affidavit

supporting the state search warrant. He is right to do so, as any probable cause deficiency with the state search warrant would, as a matter of law and logic on these facts, heavily inform any conclusion we reach about the sufficiency of probable cause in the federal warrant application. See *United States v. May*, 214 F.3d 900, 905–06 (7th Cir. 2000) (evaluating the implications of a deficient state search warrant in the context of reviewing a subsequent federal search).

Think of the analysis this way: even if we preferred to focus on the FBI affidavit supporting the federal warrant, we could not ignore Lickers's contention that the most important fact in that affidavit is the reference to the child pornography video recovered from the initial state search that he contends lacked probable cause. Lickers, in short, is on solid footing challenging the state warrant given that the state search bore the most important fruit seeding the subsequent federal search. His position is equally sound even if we reframe our focus on the affidavit supporting the federal warrant, as we would still need to disregard the reference to the evidence recovered from the state's initial search of his cell phone.

In the end, whether we focus on the state affidavit or the FBI affidavit minus the reference to the child pornography video, we land in the same place and agree with Lickers that both warrants lacked probable cause. The affidavit submitted in the state court spanned just more than a single page and, by its terms, all but acknowledged a lack of probable cause for believing child pornography would be present on the cell phone. In one place, Inspector McVey explained that Craigslist, which Lickers said he was viewing on his phone when the police approached his car, allows access to sites containing both adult and child pornography. In another place,

McVey observed that "[b]ecause of the defendant's activity of also watching the family with children [on the nearby playground], I believe it is possible that he may have been viewing child pornography while masturbating." In no place, though, did the affidavit go further—by, for example, explaining what it was about Lickers's behavior in the park combined with law enforcement's experience investigating child pornography offenses that made it probable, and not just possible, that Lickers's phone contained child pornography.

The moment we disregard the reference to the child pornography video in the FBI agent's affidavit, the federal warrant falls short for the same reason. We cannot conclude that what remains in the federal affidavit supplied enough facts to create a fair probability that the FBI would find child pornography on Lickers's phone. Maybe, but maybe is not probably, and that is where the federal warrant was lacking.

All of this brings us to *Leon*'s good-faith exception. The general teachings of *Leon* are clear and familiar. We know, for instance, that "[a]n officer's decision to obtain a warrant is *prima facie* evidence that he or she was acting in good faith." *United States v. Koerth*, 312 F.3d 862, 868 (7th Cir. 2002). We also know that a defendant can rebut this presumption, as Lickers attempts to do here, by showing that "the affidavit submitted in support of the warrant was 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *United States v. Olson*, 408 F.3d 366, 372 (7th Cir. 2005) (quoting *Leon*, 468 U.S. at 923).

Overcoming the presumption of good faith is no small feat, as an officer cannot ordinarily be expected to question a judge's probable cause determination. See *Messerchmidt v. Millender*, 565 U.S. 535, 547 (2012) (describing the threshold

for overcoming the good-faith presumption as a "high one").
Some showing of highly unusual circumstances is necessary.
See *United States v. Pless*, 982 F.2d 1118, 1126 (7th Cir. 1992)
(explaining that, under *Leon*, "even evidence that has been ob-
tained pursuant to a search warrant unsupported by probable
cause is suppressible only in limited circumstances"). Reflect-
ing this high standard, we have found that *Leon*'s protection
did not apply only on rare occasions—indeed, on only one oc-
casion in recent years. See *Owens v. United States*, 387 F.3d 607,
608 (7th Cir. 2004) (concluding that *Leon*'s good-faith excep-
tion did not apply where a "barebones" affidavit in a drug
case described only that three months earlier an informant
had bought "a quantity of crack" at a specified location).

With the *Leon* framework in place, the parties approach
the good faith inquiry by focusing exclusively on the conduct
of the state law enforcement officers who sought and then ex-
ecuted the initial state search warrant. Neither Lickers nor the
government devote a word to the conduct of the FBI agent
who obtained and executed the federal warrant. But that is
where we conclude the focus should be given the combination
of two factors. First, the federal search yielded the evidence
that resulted in the federal prosecution and conviction Lickers
now challenges on appeal. Second, nothing about the prior
state proceedings, although they resulted in the dismissal of
charges on the basis of the state court's ruling regarding the
police's initial detention of Lickers in the park, raised ques-
tions for the federal agents about the integrity of the state
search warrant application that could somehow have infected
the subsequent federal application.

To be sure, the record leaves unanswered how much the
FBI agent knew about the state court prosecution. The agent's

attaching the state court warrant application to the federal application shows he at least knew there was a state investigation. But what we cannot tell, and what Lickers has failed to offer any evidence of, is whether the agent knew that a state court prosecution followed and resulted in the suppression of evidence, including the child pornography found on Lickers's phone, and dismissal of charges. We pause on this point to underscore that, had the FBI agent possessed this knowledge, it may have been relevant to the good faith determination, and the better practice would have been to include the information in the federal application. A state court's suppression ruling may inform a federal court's subsequent assessment of a federal warrant application.

Ultimately, our review of the record leaves us of the firm mind that the process that resulted in the application for, and execution of, the federal search warrant reflected good faith on the part of the federal agents. While it is true that the FBI agent included in the federal application evidence suppressed by the state court, it is equally true that the agent took care to seek a new warrant to authorize a new, federal examination of Lickers's phone, computer, and digital camera. Nothing suggests the federal application process reflected bad faith or, more specifically, any awareness by the FBI agents who sought or executed the warrant that it was lacking in any dimension or reflected the district judge abandoning her neutral role.

On this record, then, the good faith of the FBI agents can be shown without delving into the propriety of their reliance on the fruit of an unconstitutional search as found by the state court. So we can leave for another day the question whether we are required to exclude all traces of that knowledge from

our good-faith analysis under *Leon*, a question on which other circuits have offered differing views. Compare *United States v. McClain*, 444 F.3d 556, 565–66 (6th Cir. 2005) (applying *Leon* good faith where an affidavit supporting a search warrant was tainted by evidence obtained in violation of the Fourth Amendment) with *United States v. Vasey*, 834 F.2d 782, 789 (9th Cir. 1987) (endorsing contrary reasoning and declining to apply the *Leon* good-faith exception).

At a more general level, there was nothing impermissible about the federal authorities choosing to seek the warrant as part of pursuing a federal prosecution of Lickers following the state court's suppression ruling and dismissal of the state charges. The Double Jeopardy Clause presented no barrier, a conclusion implicit in the Supreme Court's recent adherence to the dual-sovereignty doctrine. See *Gamble v. United States*, 139 S. Ct. 1960 (2019); see also *United States v. Heidecke*, 900 F.2d 1155, 1160 (7th Cir. 1990) (explaining that the Fifth Amendment does not bar a federal prosecution following acquittal in state court). Nor did the prior state court rulings somehow bind, bar, or estop the district court from considering and authorizing the federal search. See 3 Wayne Lafave, *et al.*, CRIMINAL PROCEDURE § 10.6(d) (4th ed.) ("For a ruling on a motion to suppress in a prior case to have either conclusive or presumptive effect in a later case, there must be an identity of parties. Thus, notwithstanding prior suppression by a state court, a federal court may make an independent determination as to admissibility.")

At its core, *Leon* is about encouraging responsible and diligent police work. See *Leon*, 468 U.S. at 912; see also *United States v. Glover*, 755 F.3d 811, 818 (7th Cir. 2014) ("When an officer acts within the scope of a search warrant, 'penalizing

the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations.'") (quoting *Leon*, 468 U.S. at 921). Every indication from the record is that the federal agents sought and executed the warrant in good faith. While probable cause may have been lacking from the state and federal warrants, *Leon* applies to save the federal search and the evidence derived from that search.

C

We owe a final word to Lickers's challenge to the district court's imposition of a lifetime of supervised release as substantively unreasonable and procedurally unsound.

In its presentence investigation report, the probation office recommended two concurrent 25-year terms of supervised release. Sentencing began with Lickers confirming that he had read and reviewed the report with his counsel, including by discussing the proposed conditions of supervised release. Lickers's counsel then argued for a reduced custodial sentence on the basis that the district court was sure to impose a meaningful term of supervised release with demanding conditions—all designed to monitor Lickers' behavior and minimize the risks of his reoffending. At no point did Lickers's counsel contest probation's recommendation or otherwise suggest a different term of supervised release.

After announcing the custodial sentence, the district court turned to supervised release and determined that a life term was warranted because of Lickers's risk of recidivism and ongoing need for treatment. At that point, neither Lickers nor his counsel voiced any concern or raised any objection, and the proceeding then wound to conclusion with the court asking

whether either party "wish[ed] for any further elaboration as to the reasons for imposing sentence." By its terms, the question invited inquiry into any aspect of the announced sentence, including whether facts and circumstances justified something less than a lifetime of supervised release. Both parties answered no.

The record lends itself to the conclusion that Lickers made a conscious and deliberate choice not to ask the district court to revisit or elaborate further on the propriety of a lifetime of supervised release. He may therefore have waived the procedural challenge he now wishes to advance on appeal to the imposition of a life term of supervised release. See *United States v. St. Clair*, No. 18-1933, 2019 WL 2399597, at *2 (7th Cir. June 7, 2019) (concluding that the defendant waived a challenge to a particular condition of supervised release after receiving advance notice of the recommended condition in the presentence report, reviewing the report with counsel, and raising no objection at sentencing); *United States v. Ranjel*, 872 F.3d 815, 821 (7th Cir. 2017) (applying similar waiver principles to a challenge to the length of supervised release).

Even if the better reading of the record is that Lickers forfeited (but did not intentionally relinquish and thereby waive) his procedural challenge to the length supervised release, we would review any procedural challenge to the imposition of the life term for plain error. See *United States v. Oliver*, 873 F.3d 601, 607 (7th Cir. 2017).

Either way—waiver or forfeiture—we see no error in the district court's imposition of a lifetime of supervised release. Indeed, Judge Darrow brought the same care to sentencing Lickers that she did to his Fourth Amendment claims. The record shows that she engaged in a thorough discussion of the

sentencing factors delineated in 18 U.S.C. § 3553(a), empha-
sizing the danger Lickers presented to young children—evi-
denced foremost by a series of instant messages in which he
expressed his desire to engage in sexual contact with tod-
dlers—as well as his accompanying need for ongoing treat-
ment. Each of these reasons supported the imposition of a life
term of supervised release. See *id*. at 611 (explaining that "a
district court need only provide one overarching explanation
and justification" under § 3553(a) for both terms of imprison-
ment and supervised release).

A lifetime of supervised release also fell within the advi-
sory range of the Sentencing Guidelines and therefore was
presumptively reasonable. See *United States v. Gama-Gonzalez*,
469 F.3d 1109, 1110 (7th Cir. 2006). So, too, have we upheld
terms of lifelong monitoring in similar child sex offense cases.
See, *e.g.*, *United States v. Burrows*, 905 F.3d 1061, 1067 (7th Cir.
2018); *United States v. Fifer*, 863 F.3d 759, 770 (7th Cir. 2017).

For these reasons, we AFFIRM.