In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 22-1179

JACOB D. LICKERS,

*Petitioner-Appellant,*

*v.*

UNITED STATES OF AMERICA,

*Respondent-Appellee.*

———————————

Appeal from the United States District Court for the
Central District of Illinois.
No. 4:20-cv-04164-SLD — **Sara Darrow**, *Chief Judge.*

———————————

ARGUED JANUARY 8, 2024 — DECIDED APRIL 12, 2024

———————————

Before WOOD, SCUDDER, and ST. EVE, *Circuit Judges.*

SCUDDER, *Circuit Judge.* Five years ago we affirmed the conviction of Jacob Lickers for transporting and possessing child pornography. He has since moved to vacate his convictions under 28 U.S.C. § 2255, alleging that his trial and appellate counsel rendered ineffective assistance in connection with an unsuccessful motion to suppress. The district court denied relief, and we affirm. Explaining why requires us to unpack a complex sequence of events involving parallel state

and federal investigations, two search warrant applications, two criminal prosecutions, two suppression rulings, and a direct criminal appeal.

**I**

**A**

In September 2015, undercover police officers Jimmy McVey and Ryan Maricle traveled to a public park in Monmouth, Illinois to meet a confidential informant. When they arrived, they saw something strange. A blue car sat parked on the shoulder of a road running next to the park, half on the road and half in the grass. Inside, the car's lone occupant, Jacob Lickers, "appeared excited, repeatedly looking toward the passenger seat, down at his lap, and then at a family with young children on a nearby playground." See *United States v. Lickers*, 928 F.3d 609, 613 (7th Cir. 2019). From afar Officers McVey and Maricle thought that Lickers might be a drug addict because his jerky movements resembled the "tweaking" that sometimes accompanies withdrawal. *Id.*

Upon approaching the vehicle and looking inside, the officers saw Lickers sitting in the driver's seat with a red dish towel draped over his lap. His cellphone rested on the passenger seat. At first Officers McVey and Maricle—who were dressed in plain clothes for their undercover assignment—impersonated drug dealers and asked Lickers if he was looking for pills. When Lickers said no, McVey and Maricle changed course, disclosed that they were police, and asked Lickers for identification. Lickers obliged.

By this point, Lickers appeared nervous. He was "breathing heavily" and furtively attempting to "knock his cellphone off the seat to the floor of the car." *Id.* All the while—and

despite "repeated requests to keep his hands visible"—Lickers kept his hands hidden beneath the towel. *Id.* Fearing the presence of a weapon, Officer Maricle ordered Lickers to remove the towel from his lap. Lickers complied, and the reason for his panicky behavior became clear—the towel was covering his exposed genitals. When Officer McVey demanded an explanation, Lickers divulged that he was looking at Craigslist and began to admit that he was "self-pleasuring" before catching himself and insisting that he was urinating into a cup. *Id.*

Suspecting Lickers of public masturbation, Officer McVey ordered Lickers to get dressed and exit the car. When Lickers opened the door, McVey smelled marijuana emanating from within. Lickers declined the officers' request to search the car, so they radioed for a K9 unit. The unit arrived about half an hour later and a drug dog alerted to the presence of marijuana near the passenger's side door. A search of the car uncovered about an ounce of marijuana. When Lickers admitted that the marijuana was his, he was placed under arrest for drug possession.

A more thorough inventory search resulted in the recovery of Lickers's cell phone, a laptop computer, and a digital camera from within the car. Officer McVey obtained a state court warrant later that day authorizing the forensic examination of those devices. Lickers's phone and computer both contained child pornography.

B

With this evidence in hand, state prosecutors charged Lickers in Warren County Circuit Court with possessing child pornography and marijuana in violation of Illinois law.

Lickers retained Daniel Dalton to defend him, whose first step was to file a motion to suppress that challenged the constitutionality of Officer McVey and Maricle's actions in the park. Dalton's principal contention was that the officers lacked reasonable suspicion to believe that Lickers had committed a crime when they initially seized him. Alternatively, Dalton argued that too much time had elapsed from when Officer McVey first smelled marijuana to when the K9 unit arrived on scene. See *United States v. Robinson*, 30 F.3d 774, 784 (7th Cir. 1994) (explaining that investigatory stops must be reasonable in both "scope and duration").

Dalton's strategy proved sound. The state court agreed with both arguments and suppressed all "physical evidence seized" during the stop, along with any statements Lickers made to Officers McVey and Maricle. The prosecution then dismissed all charges, bringing the state case to a swift end.

C

Not keen to let Lickers go unpunished, state officials referred the case for potential federal prosecution. In February 2016, FBI Special Agent Steven Telisak took possession of Lickers's phone and laptop to conduct an additional forensic examination. Although he believed that "the FBI might already have all the necessary authority" to conduct this second search, given that the devices had already been searched by state authorities, he applied in federal court for a fresh warrant to ensure compliance with the Fourth Amendment.

Agent Telisak's supporting affidavit drew heavily on, and even attached a courtesy copy of, the affidavit Officer McVey filed in support of his state warrant application months before. In one regard, however, Telisak went further than

McVey. Aware of the results of the state search, Telisak informed the federal judge that Lickers's devices had already been searched and were found to contain child pornography. At no point, though, did Agent Telisak caveat that the state court had suppressed that evidence based on a finding that Lickers's arrest was unconstitutional.

The district court issued the warrant, and federal investigators discovered a litany of incriminating messages Lickers had sent using the Kik messenger application. Those messages were laden with requests for child pornography. In one, Lickers shared a video with another Kik user portraying the sexual abuse of an infant child.

D

In time, a federal grand jury indicted Lickers on counts of transporting and possessing child pornography in violation of 18 U.S.C. § 2252A(a)(1) and § 2252A(a)(5)(B). The federal prosecution proceeded much like the state one had. Lickers again hired Daniel Dalton, who again filed a motion to suppress contending that the stop in the park violated the Fourth Amendment. Unlike before, however, Dalton also attacked the state search warrant (not the federal warrant as one might expect), which he contended "was so lacking in probable cause" that the state investigators could not reasonably rely on it.

The district court held an evidentiary hearing on the motion, at which Officer McVey testified about the events leading to Lickers's arrest and the search of his phone and laptop. Although Dalton questioned McVey about a range of topics, he did not inquire about the circumstances surrounding the referral of the case to the FBI or about what, if anything, Agent

Telisak knew about the state court suppression ruling at the time he swore out his federal search warrant affidavit. The district court denied the motion, finding nothing unconstitutional about Lickers's arrest and no defect in the state search warrant requiring suppression.

Lickers ultimately elected to plead guilty, reserving the right to appeal the district court's denial of his motion to suppress. In the end, the district court sentenced Lickers to concurrent terms of 132 months' imprisonment on each count, with a lifetime term of supervised release to follow.

E

We appointed Mark Rosen to represent Lickers on direct appeal. Renewing the arguments Dalton had presented to the district court, Rosen urged us to find two Fourth Amendment violations—that the arrest of Lickers in the park was unlawful and that the state court search warrant lacked probable cause.

We took a different route. We agreed with the district court "that no aspect of the police's encounter with Lickers in Monmouth Park offended the Fourth Amendment." *Lickers*, 928 F.3d at 617. But we found ourselves puzzled by the challenge to the state search warrant. After all, it was "the federal search"—not the state search authorized by the state warrant—that "yielded the evidence that resulted in the federal prosecution and conviction Lickers … challenge[d] on appeal." *Id.* at 619. A successful attack on the state warrant could therefore benefit Lickers only to the extent it cast doubt on the federal warrant as well.

The easiest path forward, we concluded, was to construe Lickers's challenge to the state warrant as part and parcel of a larger attack on the federal warrant, the logic being that any

deficiencies in Officer McVey's state court affidavit would likewise undermine Agent Telisak's federal court affidavit given the heavy reliance the latter placed on the former. We reasoned that if the state warrant lacked probable cause, then Agent Telisak's references to the child pornography on Lickers's devices—which was found only by executing the state warrant—could not be considered in evaluating the validity of the federal warrant. See *Lickers*, 928 F.3d at 618.

Having framed the question presented on direct appeal in this way, we held that *both* warrants had been issued without probable cause, as neither warrant application foreclosed the possibility that Lickers had been viewing adult pornography in the park. That conclusion did not dispose of the case, however. We observed that in *United States v. Leon*, 468 U.S. 897 (1984), the Supreme Court recognized an exception to the exclusionary rule for evidence seized in "objectively reasonable reliance" on a search warrant later determined to have lacked probable cause. *Id.* at 922. Suppression therefore depended on whether the federal agents that procured and executed the federal warrant had "act[ed] in objective good faith." *Id.* at 920.

Although the government carried the burden to prove good faith under *Leon*, Agent Telisak's decision to apply to the federal district court for a warrant created a presumption of good faith. See *United States v. Koerth*, 312 F.3d 862, 868 (7th Cir. 2002). To rebut that presumption, Lickers had to come forward with direct or circumstantial evidence that the federal officers acted in an objectively unreasonable manner. See *Leon*, 468 U.S. at 922–23; see also *United States v. Matthews*, 12 F.4th 647, 653 (7th Cir. 2021) (describing burden shifting framework). This is a difficult showing to make even under

the best of circumstances. See *United States v. McMurtrey*, 704 F.3d 502, 509 (7th Cir. 2013). In Lickers's case, it proved all but impossible.

Because Dalton and Rosen placed such heavy focus on the state warrant, Lickers lacked the evidence he needed to demonstrate bad faith on the part of the federal officers, in particular Agent Telisak. As we observed at the time, "[n]either Lickers nor the government devote[d] a word to [Agent Telisak's] conduct." *Lickers*, 928 F.3d at 619. The only evidence potentially suggestive of bad faith was Agent Telisak's omission of the state court's suppression ruling from his search warrant affidavit. But here, too, Lickers "failed to offer any evidence" of what Telisak knew, if anything, about that ruling at the time he swore out his affidavit. *Id.* "[O]ur review of the record" thus left "us of the firm mind that the process that resulted in the application for, and execution of, the federal search warrant reflected good faith on the part of the federal agents." *Id.* Because *Leon* applied to save the federal search warrant, we affirmed the district court's denial of Lickers's suppression motion.

F

Lickers moved to vacate his convictions under 28 U.S.C. § 2255. Invoking his constitutional right to the effective assistance of trial and appellate counsel, see *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (trial counsel); *Evitts v. Lucey*, 469 U.S. 387, 396–97 (1985) (appellate counsel), he argued that Dalton and Rosen took missteps litigating his motion to suppress that were so grave and inexcusable that his lawyers failed to function "as the 'counsel' guaranteed" to him by the U.S. Constitution. *Strickland*, 466 U.S. at 687.

As Lickers saw things, Agent Telisak's omission of the state court's suppression ruling from his federal search warrant affidavit was strong evidence of bad faith that Dalton and Rosen unjustifiably failed to leverage. Lickers's motion identified two primary ways that Dalton could have done so.

*First*, Dalton could have moved for an evidentiary hearing under *Franks v. Delaware*, 438 U.S. 154 (1978). *Franks* requires the suppression of evidence obtained by virtue of a warrant procured through knowing or reckless deception. See *id.* at 155–56. A defendant who makes a "substantial preliminary showing" that a search-warrant affiant acted in bad faith by knowingly or recklessly including material falsehoods in or omitting material information from a search warrant affidavit is entitled to an evidentiary hearing on that claim. See *McMurtrey*, 704 F.3d at 504–05. Lickers alleged that Dalton was deficient for failing to move for such a hearing, emphasizing that even if Dalton fell short of obtaining suppression in the district court, such a hearing would have given Lickers an invaluable opportunity to gather the evidence he needed to overcome *Leon*'s presumption of good faith on direct appeal.

*Second*, Lickers criticized Dalton's failure to question Officer McVey at the federal suppression hearing about "whether, when, and how he informed [Agent] Telisak or any other federal officers of [the] state warrant's suppression."

Lickers's motion said less about Rosen's appellate representation but appeared to take the position that Rosen had had all he needed to overcome *Leon* on appeal, notwithstanding Dalton's failure to develop the record in the district court. It also criticized Rosen for not pressing a *Franks* argument on appeal.

In opposing § 2255 relief, the government presented sworn affidavits from Dalton and Rosen explaining their reasons for not approaching the defense in the ways Lickers identified. Dalton stated that he had considered Agent Telisak's omission of the state court's suppression ruling from the federal warrant application to be immaterial because it concerned the constitutionality of Lickers's arrest and was not "based on a finding that the warrant application lacked probable cause." He further stressed that "the state suppression ruling was in no way binding on the District Court." Rosen, for his part, explained that he did not raise the issue of Agent Telisak's bad faith on direct appeal because it had not been presented to the district court.

The district court denied Lickers's motion without holding an evidentiary hearing. Two considerations proved important to the district court. As a procedural matter, the district court read our decision on direct appeal to establish that Agent Telisak acted in good faith, a ruling it did not believe Lickers could relitigate through his § 2255 motion. As a substantive matter, the district court concluded that Lickers's ineffective-assistance claims failed because the state court suppression ruling was immaterial to a proper analysis of the federal search warrant application.

This appeal followed.

## II

Before reaching the merits of any ineffective-assistance claims, we must determine whether the district court was correct to conclude that Lickers is procedurally barred from revisiting Agent Telisak's good faith in this post-conviction proceeding. The government defends that holding under the law

of the case doctrine, "a longstanding rule of federal practice," *Peoples v. United States*, 403 F.3d 844, 847 (7th Cir. 2005), that provides that legal rulings rendered at one stage of a lawsuit should not, as a general matter, be reexamined in subsequent stages, see *Cannon v. Armstrong Containers Inc.*, 92 F.4th 688, 701 (7th Cir. 2024).

Although more commonly applied to interlocutory rulings, the law of the case doctrine limits the scope of post-conviction review as well. See *Peoples*, 403 F.3d at 847. We have repeatedly recognized that when an appellate court decides an issue in resolving a defendant's direct criminal appeal, a defendant "cannot start from scratch [under § 2255] and ask the judiciary to proceed as if the first resolution had not occurred." *Id.*; see also *White v. United States*, 371 F.3d 900, 902 (7th Cir. 2004); *Fuller v. United States*, 398 F.3d 644, 648 (7th Cir. 2005). Invoking that principle here, the government reads our opinion on direct appeal to have conclusively decided that Agent Telisak acted in good faith and urges us to adhere to that ruling as law of the case.

We see things differently. Foremost, we do not believe that our opinion on direct appeal reached the broad holding the government ascribes to it. To the contrary, our observation regarding Agent Telisak's good faith rooted itself only in the limited factual record before us at the time. See, *e.g.*, *Lickers*, 928 F.3d at 619 ("Ultimately, our *review of the record* leaves us of the firm mind that the process that resulted in the application for, and execution of, the federal search warrant reflected good faith on the part of the federal agents." (emphasis added)); *id.* at 620 ("Every indication *from the record* is that the federal agents sought and executed the warrant in good faith." (emphasis added)). We need not belabor the point,

however, because on the broader reading of our direct appeal opinion preferred by the government, we remain hesitant to apply the law of the case doctrine.

We have emphasized that the doctrine "is not a strait-jacket" as it establishes "no more than a presumption" that a prior ruling should be adhered to, the strength of which "varies with the circumstances." *Avitia v. Metro. Club of Chi., Inc.*, 49 F.3d 1219, 1227 (7th Cir. 1995). Indeed, we have long recognized that issues decided in a direct criminal appeal may be revisited when "there is … [a] good reason" for doing so, *Fuller*, 398 F.3d at 648, or when "the 'ends of justice' would be served" thereby. See *Shore v. Warden, Stateville Prison*, 942 F.2d 1117, 1123 (7th Cir. 1991) (quoting *Sanders v. United States*, 373 U.S. 1, 17 (1963)).

At least one very good reason exists for taking a renewed and broader look at Agent Telisak's good faith in this post-conviction proceeding. The core of Lickers's argument is that his lawyers' mistakes prevented him from gathering the evidence he needed to overcome the presumption of good faith that sunk his direct appeal. The notion that a fact-sensitive legal ruling, made on a record deficient by virtue of alleged ineffective assistance, should bind a defendant in a collateral attack challenging that very lawyering is a bridge too far for us on these facts. Were we to chart such a course, we would effectively foreclose defendants like Jacob Lickers from pursuing habeas relief for ineffective assistance that manifests in an adverse appellate finding on a material question of fact. We decline that invitation, at least in the circumstances before us here. The more just course, in our view, is to give Lickers a fair opportunity to prove what he believes any reasonable lawyer would have proved the first time around.

So we proceed to the merits of Lickers's request for relief under § 2255.

### III

### A

The Sixth Amendment provides that in all criminal prosecutions "the accused shall enjoy the right … to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. This right guarantees not just the presence of a lawyer, but instead "the *effective* assistance of counsel," *Strickland*, 466 U.S. at 686 (emphasis added) (citation omitted), meaning legal services that are objectively reasonable. See *id.* at 687–88.

The Due Process Clauses of the Fifth and Fourteenth Amendment have been interpreted to guarantee a similar right to the effective assistance of appellate counsel in a state or federal defendant's "first appeal as of right." *Evitts*, 469 U.S. at 396; *Steele v. United States*, 518 F.3d 986, 988 (8th Cir. 2008). Although the Supreme Court has yet to articulate a standard to govern such claims, see *Evitts*, 469 U.S. at 392; see also *Fern v. Gramley*, 99 F.3d 255, 257 (7th Cir. 1996), we have tended to review them under the same standard that applies to Sixth Amendment challenges. See, *e.g.*, *Minnick v. Winkleski*, 15 F.4th 460, 470–71 (7th Cir. 2021). Neither Lickers nor the government urges a different approach, so we will follow that practice here.

Under the Supreme Court's decision in *Strickland v. Washington*, Lickers must demonstrate that the performance of Daniel Dalton in the district court and Mark Rosen on direct appeal "fell below an objective standard of reasonableness" and that their "deficient performance so prejudiced his defense that it deprived him of a fair trial." *Fountain v. United*

*States*, 211 F.3d 429, 434 (7th Cir. 2000) (citing *Strickland*, 466 U.S. at 688–94). These "are at best difficult showings to make." *Ebert v. Gaetz*, 610 F.3d 404, 411 (7th Cir. 2010).

On appeal Lickers continues to insist that Dalton and Rosen botched his motion to suppress by failing to argue that Agent Telisak acted in bad faith by omitting the state court's suppression ruling from his federal search warrant affidavit. He also faults each for failing to take appropriate and available measures to develop the record on that issue.

In evaluating Dalton and Rosen's performance, we must make "every effort … to eliminate the distorting effects of hindsight." *Strickland*, 466 U.S. at 689. As the Supreme Court explained in *Strickland*, it can be "all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission … was unreasonable." *Id.* We best resist this temptation by putting ourselves in defense counsel's shoes at the time of the challenged acts or omissions. We must then evaluate—from that perspective—whether counsel's "conduct falls within the wide range of reasonable professional assistance," bearing in mind that "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 689–90.

B

Reviewing Dalton and Rosen's actions with these principles in mind, we agree with the district court that Lickers's ineffective-assistance claims fall short. The government concedes on appeal that Agent Telisak was aware of the state court's suppression ruling at the time he swore out his federal search warrant affidavit. And we assume for the sake of

argument that had Dalton convinced the district court to hold a *Franks* hearing or conducted a more pointed examination of Officer McVey at the federal suppression hearing that the district court did hold, it might have been possible to gather the kind of evidence needed to overcome the presumption of good faith that ultimately proved fatal to Lickers's direct criminal appeal (or, more straightforwardly, to secure suppression under *Franks* itself). But even then, Lickers's claims fail.

Just because an argument has some remote chance of prevailing does not mean that a lawyer is constitutionally deficient for failing to bring it. Whether a lawyer provides ineffective assistance by failing to raise an argument depends in important part on its likelihood of success. See *Goins v. Lane*, 787 F.2d 248, 254 (7th Cir. 1986) ("Trial counsel is not obligated to present every conceivable theory in support of the defense."); *Shaw v. Wilson*, 721 F.3d 908, 915 (7th Cir. 2013) ("Appellate lawyers are not required to present every non-frivolous claim on behalf of their clients—such a requirement would serve to bury strong arguments in weak ones."). Lawyers cannot be faulted for eschewing the proverbial kitchen sink and instead focusing on arguments with better odds. After all, "trial counsel may undermine the credibility of the defense of his client if he simply presents the court with a barrage of attacks." *Goins*, 787 F.2d at 254; see also *Strickland*, 466 U.S. at 681 (describing advocacy as "an art and not a science" and taking pains to emphasize that "strategic choices must be respected" when "based on professional judgment").

In his affidavit, Dalton anchored his decision not to pursue the question of Agent Telisak's good faith in the practical disconnect between the content of the state court's suppression

ruling and the nature of the federal warrant application. Several considerations lead us to conclude that this rationale was wholly reasonable in the circumstances of this case.

It would be one thing if the state court's suppression ruling opined on whether Officer McVey's state search warrant affidavit sufficed to support a finding of probable cause. In that case, as we observed on direct appeal, it could well have "inform[ed]" the federal court's determination whether Agent Telisak's affidavit, modeled as it was on McVey's, likewise established probable cause. *Lickers*, 928 F.3d at 619. But remember that the state court suppression ruling said nothing about the state search warrant. It was instead premised on the state court's conclusion (one with which we disagreed on direct appeal) that Lickers's arrest in Monmouth Park was unconstitutional.

At most, then, the state court suppression ruling would have alerted the district court to the possibility that evidence described by Agent Telisak in his federal affidavit was the fruit of an unconstitutional search. Although this is no doubt generally important information, it is difficult on the actual facts of this case to see what legal bearing it could have had on the district judge's decision to issue the warrant. That substance of that ruling—with which we later disagreed—was in no way binding on the district judge. See *id.* at 620. More importantly, it is not the practice of issuing magistrates to hold quasi-suppression hearings, before the government brings federal charges, to determine whether information described in a search warrant affidavit is the fruit of an unconstitutional search. Instead, such issues are litigated precisely as they were in the district court: through a pre-trial motion to suppress.

In these circumstances, Dalton had no reason to assume that Agent Telisak omitted information about the state court suppression ruling with the intent to withhold facts and mislead the federal court into authorizing an unconstitutional search. And we find this especially so in light of Agent Telisak's express assurance to the district court that he was seeking the second warrant "out of an abundance of caution" and to ensure "compl[iance] with the Fourth Amendment." Agent Telisak, like attorney Dalton, may simply have believed that the search warrant application was not the proper time to litigate the constitutionality of Lickers's arrest.

But even if a reasonably competent attorney would have entertained serious doubts about Agent Telisak's good faith, neither of the steps Lickers believes Dalton should have taken to explore that issue were so likely to succeed as to make the failure to pursue them constitutionally problematic. In light of the factual and logical disconnect we have described between the state court suppression ruling and the federal search warrant application, Dalton would have faced considerable difficulty making the substantial preliminary showing of materiality necessary to obtain a *Franks* hearing. See *McMurtrey*, 704 F.3d at 504–05; *Shell v. United States*, 448 F.3d 951, 957–58 (7th Cir. 2006).

Our court has long assessed materiality under *Franks* using the so-called "hypothetical affidavit" test. Applying it is usually straightforward. "We eliminate the alleged false statements, incorporate any allegedly omitted facts, and then evaluate whether the resulting 'hypothetical' affidavit would establish probable cause." *Betker v. Gomez*, 692 F.3d 854, 862 (7th Cir. 2012). If it would not, the information is material—not necessarily individually, but at least collectively. Why?

Because, in the aggregate, the inclusion or omission from the affidavit of that bundle of information contributed to an erroneous finding of probable cause.

Applying that test is difficult in a case like this, where the affidavit lacks probable cause even *before* it is corrected to remove the taint of the alleged falsehoods or deceptive omissions. Nonetheless, it is not abundantly clear how the omission of a state court suppression ruling having no logical connection with the task before an issuing magistrate could be deemed material under our precedent—particularly where, as here, the merits of that ruling are erroneous as a matter of law. We need not take a definitive view of that question, however. It is enough to observe that any such contention would be a novel extension of our case law and to reiterate the longstanding "principle that '[t]he Sixth Amendment does not require counsel to forecast changes or advances in the law.'" *Coleman v. United States*, 79 F.4th 822, 831 (7th Cir. 2023) (quoting *Lilly v. Gilmore*, 988 F.2d 783, 786 (7th Cir. 1993)).

Nor do we believe that it was constitutionally deficient for Dalton to refrain from questioning Officer McVey about Agent Telisak at the federal suppression hearing. Having decided to focus his motion to suppress on the constitutionality of Lickers's arrest—a strategy which, it is worth emphasizing, succeeded in the state court—and the adequacy of McVey's affidavit to establish probable cause, Dalton can hardly be blamed for limiting himself to questions relevant to those issues.

All of this prevents us from concluding that Dalton's failure to move for suppression under *Franks* or to probe Agent Telisak's knowledge about the state court proceedings in other ways was so misguided as to fall outside "the wide

range of reasonable professional assistance" contemplated by the Sixth Amendment. See *Strickland*, 466 U.S. at 689.

To be sure, it is tempting with the benefit of hindsight to question the wisdom of Dalton's inattention to Agent Telisak. But "[a] fair assessment of attorney performance requires that every effort be made … to evaluate the conduct from counsel's perspective at the time." *Id.* at 689; see also *Winfield v. Dorethy*, 956 F.3d 442, 457–58 (7th Cir. 2020). Heeding that admonition here, and applying *Strickland*'s "strong presumption that counsel's conduct" was reasonable, *Strickland*, 466 U.S. at 689, we conclude that Dalton satisfied the Sixth Amendment's demands. Although he may not have provided "perfect representation," *Strickland* "guarantee[s] … only a reasonably competent attorney." *Harrington v. Richter*, 562 U.S. 86, 110 (2011) (cleaned up). "Just as there is no expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities." *Id.*

Our conclusion that Dalton did not provide ineffective assistance compels the same conclusion with respect to Rosen. By the time Rosen took the reins on direct appeal, Dalton had neither challenged Agent Telisak's good faith nor developed a record on the issue. Lickers suggests that Rosen had all he needed to overcome *Leon*'s presumption of good faith. We disagree. Even assuming Rosen could prove that Agent Telisak knew about the state court's suppression ruling, it does not follow, for reasons we have already explained, that Telisak omitted that information in bad faith. Given the state of the record on appeal, Rosen did not have the evidence necessary to overcome the presumption of good faith under *Leon*.

Finally, to the extent Lickers contends that Rosen should have challenged the district court's failure to hold a *Franks* hearing, that argument was foreclosed by Dalton's failure to move for such a hearing on Lickers's behalf. To our knowledge, we have never held that a district court's failure to hold a *Franks* hearing on its own motion can amount to the kind of "clear" or "obvious" error of which appellate courts can take notice on plain error review. See *United States v. Olano*, 507 U.S. 725, 734 (1993). But assuming without deciding that is a possibility, this is not such a case. Given our conclusion that Lickers's own trial counsel could reasonably refrain from moving for a *Franks* hearing, it follows *a fortiori* that the district court did not commit plain error by failing to take that step either.

We therefore have little trouble concluding that Rosen, like Dalton, provided Lickers with constitutionally adequate representation.

**IV**

This case exemplifies the practical and conceptual difficulties that can arise in our federal system of criminal justice, where state and federal criminal law often overlap and where a defendant can by a single act trigger separate prosecutions by separate sovereigns. In the context of parallel state and federal proceedings, rulings issued by one court may well bear on issues faced by the other. Such a scenario raises thorny questions concerning what obligation, if any, actors within one system—whether they be law enforcement officers or prosecutors—have to inform the court of rulings issued by coordinate courts. Though Jacob Lickers is not entitled to the relief he seeks, the issues he pressed on appeal are important ones. Today's decision—grounded in the unusual facts of this

path-dependent case—takes no position on when, under *Leon*, a federal official is obligated to inform a federal court of the judicial ruling of a coordinate court. All we conclude is that the link between the state court's suppression ruling and Agent Telisak's federal warrant application was too attenuated to obligate Daniel Dalton and Mark Rosen under *Strickland* to explore the possibility that its omission was a product of bad faith.

For these reasons, we AFFIRM.